611 F.2d 1066
 UNITED STATES of America, Plaintiff-Appellee,
v.
Scott Paul BUTLER, Michael Thomas Smith, a/k/a Thomas M.
Smith, Garrison Dorminy Barnes, Thomas Richard Wingate,
Robert Raymond Barnes, William Arthur Hiscock, John Richard
Barnes, Jr., George Gary Holder, Robert Tyler Milne, Hugh
Thomas McConaghy, Joseph Henry Cusanelli, a/k/a William
Joseph and Frederick John Fazio, Defendants-Appellants.
 No. 78-5777.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 14, 1980.
Rehearing and Rehearing En Banc Denied April 18, 1980.
 
 James K. Jenkins, Atlanta, Ga., for Scott Paul Butler.
 Steadman S. Stahl, Jr., Hollywood, Fla., for defendants-appellants.
 Kathrine L. Henry, William H. McAbee, Asst. U. S. Attys., Savannah, Ga., for plaintiff-appellee.
 Appeals from the United States District Court for the Southern District of Georgia.
 Before THORNBERRY, CHARLES CLARK and KRAVITCH, Circuit Judges.
 KRAVITCH, Circuit Judge.
 
 
 1
 Appellants, except Hugh Thomas McConaghy, were convicted in the Southern District of Georgia of conspiracy to possess marijuana, 21 U.S.C. § 846, and aiding and abetting each other in the possession of marijuana with the intent to distribute, 21 U.S.C. § 841(a)(1),[1] 18 U.S.C. § 2. McConaghy was convicted only of aiding and abetting. All appeal their convictions. We affirm.
 
 I. Facts
 
 2
 This is another in the apparently unending procession of marijuana importation cases. On July 21, 1978, an officer of the Glynn County Police Department noticed three white males in a car, the rear of which was elevated. Upon later observing the car at the Ramada Inn, the officer became suspicious and began surveillance directed at the driver of the car (John Barnes) and others with whom he came into contact. Surveillance continued from July 21 to July 29 and culminated in the arrest of fourteen people.
 
 
 3
 On the night of Friday, July 28, a DEA agent conducting aerial surveillance observed a shrimp boat, an Aqua Sport boat which had been previously observed,[2] and a small cruise boat tied up at the dock of the West Point Plantation. Shortly thereafter, a tractor-trailer truck which also had been previously observed[3] arrived at the Plantation. The combination of the arrival of the tractor-trailer and the docking of the shrimp boat resulted in the Plantation being identified as the target area.
 
 
 4
 The Plantation was placed under tight surveillance. Kelly Goodowens, the DEA agent in charge, and Det. Starling, a Glynn County police officer, set up surveillance on a nearby dock.[4] Activities at the Plantation were observed by the officers through night goggles.[5] Other law enforcement officers were located along the only road into the Plantation, in the general area, and in boats on the waterways.
 
 
 5
 Through the night goggles the officers observed people carrying bundles which appeared to be marijuana[6] from the shrimp boat onto the Plantation property. The observation continued until approximately 2:35 a. m. Goodowens testified he planned to initiate the arrests as soon as the vehicle started to move from the scene. At approximately 2:35 a. m., Goodowens heard a vehicle start and saw its brake lights come on. He gave the signal for the arrests. When he and Det. Starling arrived at the yard of the Plantation, they observed no activity. After a few minutes several individuals came out of the house and began moving bundles from the rear of the tractor-trailer into the house. The remainder of the arrest team arrived and the arrests were initiated.[7]
 
 
 6
 The visible marijuana was seized immediately and the house was secured. Goodowens then departed to obtain search warrants for the house, the vehicles and the hotel rooms occupied by the suspects. He arrived at the magistrate's house at approximately 4:30 or 5:00 a. m.; the search warrants were signed at 7:10 a. m. and executed later in the morning.
 
 
 7
 A four count indictment was returned against all defendants charging them with conspiracy to possess marijuana, aiding and abetting each other in the possession of marijuana with the intent to distribute, conspiracy to import marijuana, and aiding and abetting each other in the importation of marijuana. At trial, a directed verdict of acquittal was entered as to all defendants on the importation counts. John Raymond McConaghy was acquitted of both remaining counts, and Hugh Thomas McConaghy was acquitted of conspiracy to possess. All other defendants were convicted both of conspiracy to possess and aiding and abetting. All appeal their convictions.[8]
 
 
 8
 Four issues are presented on appeal: (1) whether the grand and petit juries were legally constituted; (2) whether the motion to suppress should have been granted; (3) whether Hugh Thomas McConaghy was entitled to a severance; and (4) whether the evidence is sufficient to sustain the guilty verdicts.
 
 II. Issues
 A. Jury Challenges
 
 9
 Appellants raise constitutional and statutory challenges to the grand and petit jury selection systems being used in the Southern District of Georgia. We find these challenges to be without merit.
 
 
 10
 Under Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), in order to prove a prima facie violation of the fair cross-section requirement of the Sixth Amendment, the defendant must prove:
 
 
 11
 (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
 
 
 12
 The claims raised here are essentially identical to those raised in United States v. Maskeny, 609 F.2d 183 (5th Cir. 1980), which also involved challenges to the jury system in the Southern District of Georgia. Like the Maskeny court, we need not decide whether each of the groups which the appellants assert have been excluded are "distinctive groups" because we find they have failed to show a constitutionally impermissible disparity between the group's representation in the jury system and its representation in the population.[9] None of the disparities urged by the appellants are as great as the 10% Disparity found not to present a case of purposeful discrimination in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).[10] Like the Maskeny court, we decline to abandon the absolute disparity method for dealing with jury challenges. 609 F.2d at 190.
 
 
 13
 As in Maskeny, appellants contend there are violations of the National Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 Et seq. They argue the statute has been violated because: (1) a source of names in addition to voter registration lists was not used; (2) the one year district residency requirement is unconstitutional; (3) the ministerial exemption or its application violates the first amendment and the cross-section requirements; and (4) the clerk usurped the function of the district judge in excusing jurors in violation of the statute. All of these arguments were presented to the court in Maskeny and rejected. For the reasons fully discussed in Maskeny, 609 F.2d at 191-94, we hold there has been no statutory violation.
 
 B. Motion to Suppress
 
 14
 The exact nature of appellants' contention is unclear. Apparently, they claim that the arresting officers acted without probable cause and that there were no exigent circumstances justifying the warrantless search, seizure of personalty and incidental arrests.
 
 
 15
 The problem with the appellants' contention is that they are viewing the occurrences analytically backwards. The arrests were not incident to the search but rather the search was incident to the arrests.
 
 
 16
 Exigent circumstances are not constitutionally required to make a warrantless arrest. United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); United States v. Campbell, 575 F.2d 505 (5th Cir. 1978). Here, there is no question that probable cause existed when the arrests were made. Clearly, the facts and circumstances within the arresting officers' knowledge were sufficient to justify a reasonable person in the belief that an offense was being committed. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). The collective knowledge[11] of the investigating officers was that: a group of people arrived in the Brunswick area using aliases and exploring the area at odd hours, learning the land and water routes to a residence in a secluded setting, and bringing in boats and a moving van suitable for a smuggling operation. The chain of events on Friday supplied the additional information needed to transform merely suspicious circumstances into probable cause to believe a crime was being committed: the gathering of boats and motor vehicles around a darkened house at night, the stationing of lookouts on the river, the blocking of the entrance road and the unloading of objects which resembled marijuana bales from a shrimp boat. Thus, the arrests were founded on probable cause and the lack of a warrant is irrelevant.[12]
 
 
 17
 Once the police moved in to make the arrests, the seizure of marijuana was justifiable either as a search incident to a lawful arrest, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), or as a plain view seizure, Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Under either theory the denial of the motion to suppress was proper. Except for the "plain view" seizures made at the time of the arrests, all other searches and seizures were lawfully conducted pursuant to the search warrants subsequently obtained.
 
 
 18
 C. Hugh Thomas McConaghy's Motion for Severance
 
 
 19
 At the close of the Government's case, Hugh and John McConaghy moved for severance claiming they needed co-defendant William McConaghy to testify on their behalf. The motions were denied; John McConaghy was acquitted without the testimony.
 
 
 20
 In order to be entitled to a severance on the ground urged, the movant must demonstrate: (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the co-defendant will in fact testify if the cases are severed. United States v. Rice, 550 F.2d 1364 (5th Cir.), Cert. denied, 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977); United States v. Morrow, 537 F.2d 120, 135 (5th Cir. 1976); Byrd v. Wainwright, 428 F.2d 1017 (5th Cir. 1970). Given such a showing, the court should (1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) assess the extent of prejudice caused by the absence of the testimony; (3) pay close attention to judicial administration and economy; (4) give weight to the timeliness of the motion. United States v. Rice, 550 F.2d 1364 (5th Cir. 1977).
 
 
 21
 Considering Hugh McConaghy's motion under these criteria we hold that the court properly denied the motion for severance. The motion obviously was not timely as it was not made before the trial began and there was no showing that it was based on grounds not known prior to trial. Fed.R.Crim.P., Rule 12; United States v. Spinella, 506 F.2d 426 (5th Cir.), Cert. denied, 423 U.S. 917, 96 S.Ct. 227, 46 L.Ed.2d 147 (1975). Furthermore, the significance of the testimony as exculpatory evidence is not certain,[13] as it did not rise to the level of showing that Hugh McConaghy was not involved in the off-loading. The testimony was not so clearly exculpatory as to justify the judicial diseconomy occasioned by a severance in the middle of a trial. Finally, the need for the testimony is questionable as John McConaghy was acquitted without the testimony on the same defense theory utilized by Hugh McConaghy.
 
 D. Sufficiency of the Evidence
 
 22
 All defendants challenge the sufficiency of the evidence both as to conspiracy and on the substantive count of possession.
 
 1. Overview of the Evidence
 
 23
 The cumulative evidence collected by the DEA and local law enforcement officers revealed a number of people arriving in the Brunswick area, moving from one hotel to another in the same immediate vicinity, meeting with each other, scouting boat channels and ending up on a secluded plantation where 41,000 pounds of marijuana was off-loaded from a shrimp boat. While Agent Goodowens and Det. Starling observed the off-loading operation through night goggles, both candidly admitted they could not positively identify any individual as participating in the off-load as they could see only forms and not faces. The Government secured the area and arrested everyone present; the theory of the possession case was that everyone on the plantation property must have been involved in the off-load. The theory of the Government on the conspiracy count was one of "presence plus" additional circumstances. See e. g., United States v. Soto, 591 F.2d 1091 (5th Cir.), Cert. denied, 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979); United States v. Sink, 586 F.2d 1041 (5th Cir. 1978), Cert. denied, --- U.S. ----, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979).
 
 
 24
 2. Is the Evidence Sufficient ?
 
 
 25
 a. Conspiracy Count
 
 
 26
 In reviewing the sufficiency of the evidence, the appellate court must view the trial evidence in the light most favorable to the Government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), but must reverse the verdicts if reasonable minds must have had a reasonable doubt as to the existence of the essential elements of the crime charged. United States v. Barrera, 547 F.2d 1250, 1255 (5th Cir. 1977); United States v. Reynolds, 511 F.2d 603 (5th Cir. 1975).
 
 
 27
 In this case, as in many conspiracy cases, there is no direct, conclusive evidence of a conspiracy. There is substantial circumstantial evidence, however, that a conspiracy existed, that the appellants had knowledge of it, and that with that knowledge they acted in furtherance of the conspiracy. United States v. Soto, 591 F.2d 1091, 1101 (5th Cir.), Cert. denied, 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979); United States v. Garza, 574 F.2d 298, 304 (5th Cir. 1978); United States v. Duckett, 550 F.2d 1027, 1030 (5th Cir. 1977).
 
 
 28
 The circumstantial evidence of a conspiracy includes the following: (1) a mid-week meeting at the Holiday Inn attended by John Barnes, Robert Barnes, Fazio, Holder, William McConaghy and Cusanelli; (2) the scouting of the waterways several days before the off-load occurred; (3) the leasing of a secluded plantation; (4) the placing of guards on the river; and (5) the arrival of the shrimp boat, tractor-trailer truck and defendants at the Plantation on the same night. The totality of the circumstantial evidence indicates a well-orchestrated criminal conspiracy to possess marijuana.
 
 
 29
 Given the existence of a conspiracy, each appellant's participation in the crime must be established by evidence which a jury could conclude rules out any reasonable hypothesis of innocence. United States v. Soto, supra at 1102; United States v. Alvarez, 548 F.2d 542, 544 (5th Cir. 1977).
 
 
 30
 John and Robert Barnes acted as river lookouts on the night of the off-load, or at least the jury could so conclude. That, in combination with their apparent "scouting" of the waterways and presence at the Wednesday meeting at the Holiday Inn is sufficient evidence from which a jury could conclude the Barnes were a part of the conspiracy.
 
 
 31
 Evidence of appellant Holder's participation in the conspiracy may be found in his presence at the Wednesday meeting, the fact that many bales of marijuana were loaded on to his truck, and that he drove his truck to the Plantation on Friday. Appellant Fazio was also at the Holiday Inn meeting and accompanied Holder in his truck to the Plantation on Friday. Appellants Smith and Wingate together leased the Plantation and purchased one of the boats involved in the operation. They both were present at the scene of the off-load. Cusanelli was at the Wednesday meeting, at the Plantation on the night of the off-load, and possessed large amounts of cash and false identification papers. Hiscock was present when the shrimp boat was purchased and identified himself at that time as her intended captain. He was in possession of a large amount of cash and was arrested on the shrimp boat which was loaded with marijuana. Butler also was arrested on the shrimp boat and the evidence suggested he was a crew member (prescription bottles bearing his name were found in the crew cabin which appeared to have someone living in it).
 
 
 32
 Appellants Garrison Barnes' and Milne's presence at the Plantation, in a secluded area of the island at night, in the midst of the unloaded marijuana and wearing T-shirts bearing the name "Murray Van and Storage," clearly connects them to the conspiring group.[14] Moreover, Milne was seen running from the basement just after the flare signifying the beginning of the arrests had been fired.
 
 
 33
 There is ample evidence, viewing each appellant's conduct in the context of the overall conspiracy, to connect them beyond a reasonable doubt to the proven conspiracy. See, e. g., United States v. Soto, 591 F.2d 1091, 1102-03 (5th Cir.), Cert. denied, 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979).
 
 
 34
 b. Possession
 
 
 35
 As to the appellants discussed above, the evidence is also sufficient to support the possession convictions. For the most part the evidence which connects the defendants to the conspiracy also supports a finding that they aided and abetted others in the possession. United States v. Soto, supra at 1103.
 
 
 36
 The appellants who were arrested on the Plantation property (Fazio, Smith, Wingate, Cusanelli, Garrison Barnes and Milne) and on board the shrimp boat (Hiscock and Butler) all had marijuana sufficiently within their control to be in constructive possession. See United States v. Riggins, 563 F.2d 1264, 1266 (5th Cir. 1977), Cert. denied, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 150 (1978). The amount of marijuana possessed is sufficient to permit the jury to infer an intent to distribute. United States v. Raffo, 587 F.2d 199 (5th Cir. 1979). The evidence against appellants John and Robert Barnes, while not placing them on the Plantation property, supports a finding that they were acting as river lookouts, and hence were aiding and abetting the others in the off-load operation. Appellant Holder was arrested on the road in front of the Plantation shortly after the other arrests were made and after the area had otherwise been secured. The evidence was sufficient to sustain an inference that he had slipped by the police in the initial confusion, but had been on the Plantation property, and thus in constructive, if not actual, possession of marijuana.
 
 
 37
 There is also sufficient evidence to sustain the conviction of Hugh McConaghy. Identification papers and personal belongings of Hugh McConaghy were found inside the Plantation house. He was arrested either from under the dock or by a fence near the dock at about 8:00 a. m. on Saturday.[15]
 
 
 38
 McConaghy took the stand in his own behalf and testified he had nothing to do with the marijuana, had no knowledge that an off-load was going to occur that night and disclaimed any possessory interest in the marijuana. He indicated he had previously injured his back in a work accident, that his back had begun to hurt early Friday afternoon and that he had gone into the bedroom to lie down. He and John McConaghy, his younger brother, heard arguing. John left but Hugh did not because of his back. The next thing he remembers after John left (he slept intermittently all day) was the sky lighting up. William McConaghy came to the bedroom and told Hugh to follow him. They then hid under the dock until they were arrested. John McConaghy, who was acquitted, corroborated Hugh's story up to the point when he (John) left the Plantation.
 
 
 39
 The jury was presented with a classic credibility choice. Inasmuch as John McConaghy was acquitted we must conclude they believed him to a certain extent. That does not mean, however, that they had to believe his testimony about Hugh. Construing the evidence in the light most favorable to the Government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we cannot say there is insufficient evidence to sustain the conviction of Hugh McConaghy.
 
 
 40
 AFFIRMED.
 
 
 
 [1]
 21 U.S.C. § 841(a)(1) provides: "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."
 
 
 [2]
 The Aqua Sport boat was first observed on July 21, parked at the Ramada Inn where John Barnes was registered. On July 23, John Barnes, Robert Barnes and two others took the Aqua Sport to a public landing where it was launched. The boat was then driven to St. Simons Island where it was docked. Later that afternoon, John and Robert Barnes left the marina in the boat, headed north on the Frederica River. The boat was discovered back at the marina the next morning. The West Point Plantation is located on the Frederica River
 On July 24, John and Robert Barnes again took the boat out and again headed north on the Frederica River. They stayed out approximately four hours. On July 25, the Barnes brothers took the boat out in the same direction for approximately the same length of time. The boat was next observed that night in the course of aerial surveillance docked at the West Point Plantation.
 The next movement of the boat apparently occurred on July 28 in the early afternoon. John and Robert Barnes fueled the boat and returned it to its berth. It was launched at about 6:30, and again headed north.
 
 
 [3]
 The tractor-trailer truck was first observed on July 27 at the Holiday Inn. It was seen leaving the Holiday Inn, going to the 8 Days Inn and then to the Best Western Motel in Eulonia, Georgia. George Holder and Frederick Fazio were in the tractor-trailer truck
 The truck left Eulonia on the afternoon of July 28 and was driven to the West Point Plantation. It arrived at approximately 7:00 p. m. Observed in the truck were Holder and Fazio. The trailer of the truck bore the label "Murray Van and Storage."
 
 
 [4]
 The dock on which Goodowens and Starling were located is approximately 500 feet from the West Point Plantation dock. There is, however, an unobstructed view between the two docks
 
 
 [5]
 Night goggles amplify light, but do not magnify. Thus, despite the darkness of the night the agents were able to observe what transpired
 
 
 [6]
 Agent Goodowens testified, based on his prior experience with marijuana smuggling, that the packages being carried were packaged like marijuana typically is packaged
 
 
 [7]
 
 Defendant Place of Arrest
--------- ---------------
Scott Paul Butler on the shrimp boat docked
 at Plantation
Michael Thomas Smith in front of the Plantation
 house
Garrison Dorminy Barnes on the Plantation's dock
Thomas Richard Wingate in basement of the Plantation
 house
Robert Raymond Barnes cruise boat on the Frederica
 River south of Plantation,
 claimed to be fishing-- no
 bait on boat
William Arthur Hiscock on the shrimp boat docked
 at the Plantation
John Raymond McConaghy on a road away from the
 Plantation
John Richard Barnes, Jr. in Aqua Sport on Frederica
 River north of Plantation
George Gary Holder on the road in front of the
 Plantation
Robert Tyler Milne running from the basement
 of the Plantation
Hugh Thomas McConaghy by the fence near the dock
 or under the dock
Joseph Henry Cusanelli under the dock
Frederick John Fazio inside house
 
 
 [8]
 William Anthony McConaghy died on July 8, 1979, before this case was orally argued. Accordingly, his appeal in this matter was dismissed by order of the court
 
 
 [9]
 The groups and the disparities as urged by the appellants are as follows:
 Absolute disparity between
 presence on jury wheel
 and presence in
Group population
----- --------------------------
Non-white 8.69%
Service workers 5.71%
Youth (18-29 years old) 9.14%
 
 
 [10]
 For a discussion of the interplay between jury claims decided on equal protection grounds (Swain ) and those decided on sixth amendment grounds as are urged here, see Maskeny, 609 F.2d at 190
 
 
 [11]
 Collective knowledge rather than the sole knowledge of any individual officer is the factor to be considered when determining the existence of probable cause. United States v. Clark, 559 F.2d 420 (5th Cir.), Cert. denied, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977)
 
 
 [12]
 Equally irrelevant is the fact that the police did not make the arrests as soon as there was sufficient information to constitute probable cause. The police are under no obligation to make arrests as soon as probable cause exists, Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); United States v. Cravero, 545 F.2d 406 (5th Cir. 1976), Cert. denied, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); Koran v. United States, 469 F.2d 1071 (5th Cir. 1972)
 If, however, the arrests had been incident to a warrantless search justified on the basis of exigent circumstances, the delay would have been more significant. See United States v. Curran, 498 F.2d 30, 34 (9th Cir. 1974).
 
 
 [13]
 The defense proffer of the testimony showed William McConaghy would testify that brothers John and Hugh had arrived in the Brunswick area only to bring him (William) his jeep; Hugh had a back problem; when the flares went off to signify the onset of the arrests, William got Hugh from the bedroom of the house where he had been since early in the day (before the shrimp boat arrived) and together they hid under the dock. This would have controverted the testimony of the police to the limited extent that they testified Hugh McConaghy was arrested in the woods. (T-323)
 
 
 [14]
 The trailer into which the marijuana had been loaded also bore the label "Murray Van and Storage." Appellants Smith and Wingate and deceased appellant William McConaghy were wearing dark blue Murray Van and Storage T-shirts, also
 There is no mention in the record of how Garrison Barnes and Milne arrived at the Plantation. The jury could have reasonably concluded that they arrived either on the shrimp boat or in the trailer of the truck, as they obviously arrived before the DEA surveillance began or their arrival would have been noticed.
 
 
 [15]
 The police testified he was arrested from beside the fence near the dock; McConaghy testified he was arrested from under the dock