**UNITED STATES of America**

v.

**Albert Joseph FACCHIANO, Thomas Miglionico, Angelo Pepe, Francis C. Santo, Paul Santo, Defendants.**

No. 79–231–Cr–JCP.

United States District Court,
S. D. Florida.

Nov. 15, 1980.

Roma W. Theus, II, Dept. of Justice, Miami Strike Force, Miami, Fla., for plaintiff.

Joseph Beeler, Miami, Fla., for Facchiano.

Federico Moreno, Federal Public Defender, Miami, Fla., for Miglionico.

Edward J. O'Donnell, Jr., Miami, Fla., for F. Santo.

Donald F. Spain, Miami, Fla., for P. Santo.

Joseph Mincberg, Miami, Fla., for Pepe.

OPINION AND ORDER

PAINE, District Judge.

Pursuant to 28 U.S.C. § 1867 the defendant Facchiano has moved to stay the pro-

---

ceedings in this cause by alleging a substantial failure to comply with the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 (hereinafter the Act). Encompassed within the motion is the allegation of the abridgement of Sixth Amendment rights. This case is being tried in Fort Lauderdale and the jury master wheel is culled from the Broward County voter registration list. As an alternative, defendant prays that the trial be transferred to Miami where it is alleged that juror selection is closer to substantial compliance. The motion has been adopted by all defendants.

Basically defendant complains that there is a significant underrepresentation of blacks on the Broward division master wheel when compared with the percentage of blacks aged 18–69 in the county's general population. Support for this allegation comes mainly from a statistical analysis which highlights the extent of this disparity. It is defendant's position that those statistics have established a prima facie case and it is the government's burden to justify the disparity.

### I. The Elements of a Prima Facie Case

In *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court held:

> In order to establish a prima facie violation of the fair–cross–section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) that this underrepresentation is due to the systematic exclusion of the group in the jury–selection process.

With regard to systematic exclusion the cases have tended to fall into three categories. The first of these is the rule of exclusion cases where evidence of total exclusion of a cognizable group is prima facie proof of systematic exclusion. E. g., *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The second category

includes cases of substantial underrepresentation where the juror selection system contains opportunities for subjective acts of discrimination. E. g., *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). The burden of proof shifts in these cases upon a showing of substantial exclusion in a system that allows for discrimination. A good faith explanation by juror selection officials can rebut the prima facie case.

The third category is a statistical showing of underrepresentation in an apparently objectively organized selection process. As in this case the typical cause of underrepresentation seems to stem from a failure to register to vote. With regard to cognizability or distinctiveness, there is no doubt that the group consisting of all blacks aged 18–69 comprise a distinctive group within Broward County. Although a significant statistical underrepresentation of blacks was shown, this is held not to be a substantial deviation of a fair cross section for purposes of requiring relief. As will be discussed later, in order to reach this conclusion it is necessary to reconcile the judicial presumption that the use of a voter registration list for the sole juror source list passes Constitutional muster with the Act's provision for supplementation.

### II. The Statistical Evidence of Underrepresentation

The data utilized for compiling statistical evidence of underrepresentation came from primarily two sources. 1970 Census data was used to determine the number of whites and blacks aged 18–69 in the County's population. It is judicially noticed that within this population are a number of individuals who are not qualified to be jurors, but it is assumed that this is only a small number having a negligible effect on the data. The other main source of data were the JS–12's prepared for the Clerk of the United States District Court for the Southern District of Florida.

The JS–12 is a form that is submitted pursuant to 28 U.S.C. § 1863(a). It reflects information acquired from random samples

taken from the master wheel and the qualified jury wheel. According to the JS–12 submitted on February 9, 1978 the Fort Lauderdale division master wheel was filled on August 18, 1977 with 62,832 names from the Broward County voter registration list. On November 1, 1977, 2027 names were drawn at random from the master wheel to whom questionnaires were mailed. From the 1589 completed and returned questionnaires it was determined that 1530 people within the sample were white and 59 were non-white. The same kind of information was obtained from a sample taken from the qualified jury wheel on January 31, 1978. Although the defendant also introduced into evidence JS–12's for the West Palm Beach, Key West, Miami and Fort Pierce divisions, this challenge is only focused on the Fort Lauderdale division. Additionally, the defendant introduced JS–12's that were prepared in February 1974 and in August 1971. These forms reflect data obtained from sampling past master wheels.

By statute, 28 U.S.C. § 1863(b)(4), and the Southern District of Florida Plan for the Random Selection of Grand and Petit Jurors (hereafter the plan) the master wheel is to be emptied and refilled by September 1 of the year following each Presidential election. Of the three master wheels the greatest percentage of underrepresentation of blacks occurred in the last master wheel

sample taken in November of 1977. The Court assumes for purposes of this opinion that the data is the same for all three master wheels. Furthermore, the disparity is slightly greater in the master wheel sample than in the qualified wheel sample. The defendant's statistical expert witness, James O'Reilley, testified that by using widely recognized statistical tests, e. g., standard deviation analysis, that there was only an unmeasurably small probability that the disparity between the number of blacks in the population and the number in the master wheel could be explained by chance or sampling error. The Court finds that the disparity is indeed statistically significant and there is no basis to question the accuracy of the data. Furthermore, the difference between the data produced by the master wheel and the qualified wheel is negligible and can be ignored.

The following chart capsulizes the data and includes three statistical comparisons.

|  | Fort Lauderdale Division | Goff [6] |
|---|---|---|
| % of eligible population which is black [1] | 11.3% | |
| % of sample from master wheel which is black [2] | 3.7% | |
| Absolute disparity [3] | 7.6% | 6.17% |
| Comparative disparity [4] | -67.3% | 59.% |
| Impact on Petit Jury of 12 [5] | 0.9 | 0.7 |

1. This reflects the adjusted 1970 census which increases the number of blacks in Broward County by 7.7%. By using this figure a larger disparity results.

2. This is computed from the JS 12 which determined by random sample the number of non whites within the master wheel. Blacks would be a sub set within non whites but the effect on the statistics is negligible since there were few non whites in Broward County who were not black.

3. The absolute disparity is the absolute difference between the percentage of blacks in the eligible population and the percentage of blacks within the master wheel. It is a measure of underrepresentation of blacks within the population that could be called for jury duty.

4. Computed by: (percentage of blacks in master wheel percentage of blacks in eligible population) divided by percentage of blacks in population.

5. Measures the difference in the number of blacks in a petit jury which is caused by the underrepresentation of blacks on the master wheel. For example, if 20% of the eligible population were black while only 10% of the master wheel were black then theoretically there would be 10% × 12 = 1.2 less blacks in the average 12 man jury than if there was no underrepresentation.

6. For comparison, the statistics which applied in U. S. v. Goff, 509 F.2d 825 (5th Cir. 1975) are given. This case is discussed later.

### III. The Relevant Statistic

In *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) the Supreme Court held that purposeful discrimination is not shown by demonstrating the underrepresentation of an identifiable group by as much as 10%. Although *Swain* was an equal protection case, many Courts have adopted the proposition that an absolute disparity of not more than 10% does not establish the prima facie elements of unfair representation or systematic exclusion. *United States v. Butler*, 611 F.2d 1066 (5th Cir. 1980) *reh. denied* 615 F.2d 685 (5th Cir. 1980). The Fifth Circuit has shown a distinct preference for making absolute disparity the primary measure of underrepresentation. *United States v. Maskeny*, 609 F.2d 183 (5th Cir. 1980) and *Butler*, supra.

■ The defendants argue that where the percentage of the group's eligible population hovers around the 10% cut–off, reliance on the absolute disparity test could result in the group's total exclusion without recourse. They point out that both *Maskeny* and *Butler reh. denied* have left the door open for the use of other comparisons where it is deemed appropriate. Of course in this case, blacks have not been totally excluded but in that situation the inferences of the rule of exclusion cases would be applicable and the burden would shift to the government. The defendants contend that comparative disparity is a better indication of underrepresentation in this case. While there is no doubt that the comparative disparity,–67.3, indicates a statistically significant underrepresentation, it is necessary to realize that where the eligible population is relatively low this statistic will magnify the disparity.[7] It is held along with the preponderance of authority that an absolute disparity of 7.6% does not meet the elements of a prima facie case.

### IV. Voter Registration Lists–The Presumption of Constitutionality

The Act requires that district courts utilize voter registration lists or lists of actual voters for selecting prospective jurors. If Broward County blacks are underrepresented for any reason the most likely one is that a large percentage have failed to register. While 28 U.S.C. § 1863(b)(2) provides for supplementation of the voter list, neither the defendant nor this Court have found a case · where supplementation has been required merely to rectify the results of lower proportionate registration. In fact, the cases are rampant in holding the opposite. The Fifth Circuit said in *United States v. Arlt*, 567 F.2d 1295 (5th Cir. 1978):

The use of voter registration lists has been upheld by this Court even if an identifiable group votes in a proportion lower than the rest of the population, [at p. 1297].

The filling of the master wheel from the voter registration list is an objective and random process. By following the Jury Selection and Service Act there is no opportunity for subjective discrimination and no federal district jury selection plan which fills the wheel from a registration list has been found to be unconstitutional. *United States v. Rosenthal*, 482 F.Supp. 867 (M.D. Ga.1979).[8] A closely connected proposition

---

7. The formula for comparative disparity is

  Absolute disparity  
  The groups percentage  
  of the eligible population

As a group's proportionate share of the total population increases, thus increasing the denominator in the formula, the comparative disparity will decrease while the absolute disparity remains constant. Cf. *United States v. Whitley*, 491 F.2d 1248 (8th Cir. 1974).

8. Other cases within the legion are *U. S. v. Carter*, 568 F.2d 453 (5th Cir. 1978); *U. S. v. Test*, 550 F.2d 577 (10th Cir. 1976); *U. S. v. Coats*, 611 F.2d 37 (3rd Cir. 1979); *U. S. v.*

*Lopez*, 588 F.2d 450 (5th Cir. 1979) which was an equal protection challenge. As suggested by Judge Gewin in the Appendix to *Foster v. Sparks*, 506 F.2d 805 (5th Cir. 1975) this tact increases the evidentiary burden on the challenge to the jury selection system. An automatic allowance is made for underrepresentation due to a group's personal predilection to not register. Thus it is not necessary for the jury officials to explain that the 7.6% absolute disparity in this cause was caused by the failure of blacks to register. The burden can only be shifted if the defendant can show a disparity that is greater than what can be tolerated as a reasonable allowance.

is the fact that a group of persons choose not to register does not make the group cognizable. For example, although Jehovah's Witnesses do not register to vote due to their religious scruples, they do not for that reason alone constitute a cognizable class of non–voters. *Camp v. United States*, 413 F.2d 419 (5th Cir. 1969). *Camp* and other similar cases [9] have been used as a springboard for what has become an intractable judicial position in reference to supplementation. "[T]he circuits are in complete agreement that . . . neither the Act nor the Constitution require that a supplemental source of names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population." *United States v. Test*, 550 F.2d 577 (10th Cir. 1976) at footnote 8. But all Camp said was a group of non–voters does not become a distinct class for simply being non–voters.[10] It did not foreclose supplementation where an already recognized cognizable class, e. g., blacks, are underrepresented due to their failure to register. Yet, that is what the Courts have generally held.

Other than the statistical underrepresentation of blacks, the defendants have not alleged any other diversions from the approved plan for juror selection. The Broward County voter registration list was the only source for the master wheel and there was no evidence that blacks encountered artificial barriers that impeded registration.[11] There was also no indication that the percentage of blacks within the master wheel did not accurately reflect the percentage of black registrants.

On these kinds of facts Courts have utilized an almost irrebuttable presumption that the degree of statistical underrepresentation is within the Constitutional standard

of reasonably representative. The fact that the voter registration list is used as the only source turns a disparity into no more than a statistical phenomenon. Regardless of the statistical comparison utilized, a prima facie case of systematic exclusion cannot be obtained.

## V. The Applicable Legal Standard

■■■ Although the Jury Selection Act provides relief for "substantial failure to comply with the provisions of [the Act]" most courts have applied Sixth Amendment criteria in analyzing jury selection procedures. In terms of a challenge for underrepresentation of a distinct group, the disparity apparently must be of the nature of a Constitutional infirmity in order to invalidate the selection procedure. Thus the requirement of a fair cross section given in 28 U.S.C. § 1861 is treated as necessitating a jury that is reasonably representative of the community. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). While there is some recognition that there may be a difference between the statutory attack and a Constitutional one, where a challenge is bottomed on the premise that the master wheel must be supplemented from a source in addition to the voter registration list, it will fail for want of Constitutional infirmity. E. g., *United States v. Butler*, 611 F.2d 1066 (5th Cir. 1980).

In *United States v. McDaniels*, 370 F.Supp. 298 (E.D.La.1973) aff. sub nom. *United States v. Goff*, 509 F.2d 825 (5th Cir. 1975) Judge Alvin B. Rubin said " . . . it is irrelevant in a Jury Act challenge that the plan has been prepared and implemented in good faith, or that the discrimination, if any, is unintentional. [citations omitted] Nor need the defendant show prejudice; the only question is whether the Act has

---

9. E. g., *U. S. v. Lewis*, 472 F.2d 252 (3rd Cir. 1973).

10. See *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) which originated the concept of a distinctive or cognizable group.

11. "The use of voter registration lists as the sole source of the names of potential jurors is not constitutionally invalid, absent a showing of discrimination in the compiling of such voter registration lists." *U. S. v. Parker*, 428 F.2d 488 (9th Cir. 1970) citing as authority *Grimes v. U. S.*, 391 F.2d 709 (5th Cir. 1978).

been complied with." This would seemingly recognize a different standard for a statutory challenge. Unlike other cases which rely on the irrebuttable presumption, this case does not automatically equivocate the use of registration lists with a fair cross section. Instead, *Goff* held that the absolute impact on a grand jury of 23 persons caused by the underrepresentation of blacks was not substantial within the meaning of the Act.[12] But *careful analysis of the Fifth Circuit's more recent opinion in United States v. Maskeny*, 609 F.2d 183 (5th Cir. 1980) suggests conformity with other circuits with regard to supplementation. Although *Maskeny* cites *Goff* in recognition of the Congressional provision for supplementation, that is immediately followed with reference to *Camp* to support the conclusion that appellant's claim was without merit. As already mentioned, Camp and its progeny seemingly foreclose any Constitutional requirement to supplement.

## VI. Reconciling the Statutory Requirement for Supplementation

Thus far no Court has required supplementation of the master wheel as a result of a challenge where the voter's registration list is used as a primary source and there have been no barriers to registering. At least two cases, though, have left the door open. The defendant in *United States v. Rodriguez*, 588 F.2d 1003 (5th Cir. 1979) was tried and convicted in the Southern District of Florida. He argued that supplementation was necessary due to the large influx of Hispanics who registered to vote after the wheel was filled. The trial had taken place on August 29 through 30, 1977 but the panel was drawn from the 1973 master wheel. Relief was denied because

defendant failed to prove the existence of a cognizable class. Also it was alleged that there was a substantial failure to comply with the Jury Selection Act, but defendant requested dismissal when the only prescribed relief was a stay of the trial. In footnote 10 the Court said "To the extent, however, that appellant argues that the 1973 wheel was Constitutionally infirm and that the statute offered a reasonable method of overcoming the deficiency, his claim would generally warrant further consideration." Thus, *if* a defendant could show the master wheel not to be reasonably representative, supplementing the wheel might be appropriate.

The Fourth Circuit recently said "Nor is any supplementation of names by use of alternative lists required absent a showing that voter lists do not represent a fair cross section of the community. [footnote omitted.] With no demonstration of underrepresentation or systematic exclusion of any cognizable group, that showing has not been made here." *United States v. Coats*, 611 F.2d 37 (4th Cir. 1979) at p. 41. The Eastern District of North Carolina utilized lists of actual voters for jury selection. The defendant presented evidence that 60% of the eligible jury population were excluded since they had not voted. The implication of the opinion was that if evidence had been presented of the underrepresentation of a cognizable group due only to their failure to vote, supplementation may have been appropriate. Such a holding would be contrary to the irrebuttable presumption approach. But more likely if such a case were to arise the Fourth Circuit would interpret the last sentence of the quoted passage as requiring a showing of *both* underrepresentation and systematic exclusion rather than

**12.** This Court also finds that the impact on a petit jury in this case is not substantial under the Act. If there was no underrepresentation, one out of nine petit jurors would be black instead one out of twenty–seven. That there might be one instead of three blacks in a panel of thirty potential jurors is not sufficiently substantial to indicate a failure to comply with the Act. Despite this finding the Court is hesitant to apply the impact test to a petit jury. Unlike grand jury selection procedure, the use of peremptory challenges removes the randomness of

a petit panel. The concern is not that there be one or two blacks on each petit jury but that the average jury venire fairly represents the community making blacks potentially available to the litigants. 28 U.S.C. § 1861 says ". . . It is further the policy of the United States that all citizens shall have the *opportunity to be considered for service* on grand and petit juries . . ." (emphasis added). The probability of being given the opportunity to serve requires looking to the master wheel.

one or the other. That would be in keeping with the mainstream. One could not demonstrate systematic exclusion merely by showing a failure to vote and the third element of the prima facie case given in *Duren v. Missouri*, supra, would not be satisfied.

Nevertheless the trend in the cases is to hold that (a) where the voters registration list is used to fill the juror master wheel, (b) there are no artificial barriers to registration, (c) and a statistically significant failure to register causes the underrepresentation of some cognizable group within the master wheel then (d) by virtue of (a) and (b) the master wheel is reasonably representative of the community. Yet 28 U.S.C.A. § 1863(b)(2) provides "... The plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title ..." The question then becomes under what conditions should supplementation be prescribed where the most obvious condition, failure to register, has been held not to produce a constitutional infirmity.

It is presumed that Congress intended that supplementation would occasionally be used. The quoted sentence is not surplusage. The Court has surmised a number of conditions where supplementation might be appropriate. One possibility is where the proportions of groups represented within the master wheel does not reasonably reflect the proportions within the registration list. However, the statistical improbability of this occurring where random samples are utilized makes it doubtful that Congress had considered this. Another possibility would be to raise the number of names in the master jury wheel to at least one–half of one percent of the total numbers on the list used as a source of names in accordance with 28 U.S.C.A. § 1863(b)(4). But this sub–section provides that "The chief judge of the district court, or such other district court judge as the plan may provide, may order additional names to be placed in the master jury wheel from time to time as necessary," which would make the (b)(2) provision superfluous. Perhaps what the Courts are looking for is specific evidence regarding the disproportionate impact, if any, of the use of voter registration lists. E. g., see footnote 10 of *Test, supra*. But in light of the *Camp* line of cases it is not certain that proof of disproportionate registration as opposed to merely making that assumption from a showing of statistical underrepresentation would make any difference. It is more likely that supplementation is only a statutory requirement, the absence of which does not abridge constitutional reasonably representative standard.

The provision for supplementation makes specific reference to the rights protected and policies of the Jury Selection and Service Act. The rights protected are given in 28 U.S.C.A. § 1862, "No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin, or economic status." While the language of this sub–section takes the perspective of equal protection, it is in effect the legislative version of the Sixth Amendment standard. This conclusion is reached because 28 U.S.C.A. § 1867 provides relief to defendants rather than excluded jurors. While the effect of relief may benefit a possible class of excluded jurors, Courts have construed Congressional intent to apply the lesser Sixth Amendment standard. (Cf. *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) for the elements of a prima facie equal protection case.) Nevertheless, § 1862 has been construed so that a juror cannot be considered to be excluded from service due to the failure to register. The net effect is to make it unnecessary to ever require supplementation to protect the guaranteed rights since the use of the voter registration list is all the protection required. Thus there is no constitutional ba-

sis for supplementing the voter registration list.[13]

28 U.S.C.A. § 1861 provides

It is the policy of the United States that all litigants in Federal Courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the Court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

Policies of the United States are distinguishable from constitutional protections in terms of giving Courts discretion to grant relief. This section specifically refers to litigants in federal courts. Since the Sixth Amendment has been made applicable to the states through the Fourteenth Amendment, *Duncan v. State of Louisiana*, 391 U.S. 145,. 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) Congress may have intended that the policies to be instituted under the Act would not be congruent with the constitution. Thus supplementation of the voter registration list, although not constitutionally mandated, could further the statutory policy of providing the litigants with a fair cross section of jurors. Under this interpretation, statistical evidence of underrepresentation becomes highly prohibitive of the kinds of concerns which supplementation was intended to alleviate. Commonsense tells us that if for some reason a cognizable group is not proportionately represented within the master wheel, then the policy is to make a reasonable effort to bolster that group's representation.

The statistics in this case are indicative that the Broward Division master wheel should be supplemented. A cognizable minority comprising approximately 11% of the eligible population with an absolute disparity that exceeds 7% is not satisfactorily represented. A statistical guideline which is helpful for fostering this policy is mentioned in the Gewin Appendix to *Foster v. Sparks*, 506 F.2d 805 (5th Cir. 1975). Under the guideline, a 20% deficiency is deemed to be allowed so that if blacks comprise 10% of the eligible population they must comprise at least 8% of the master wheel. A similar test requires that if X% of eligible whites are registered voters, then at least (.8)(X%) of the voting age blacks should be eligible for being chosen for the master wheel. Supplementation would then be required if the proportion of black registrants is significantly under the proportion of white registrants. Although the Court in the instant case did not receive evidence of the percentage of registrants the statistics would strongly suggest that blacks do register to vote in a lower proportion than whites.

█ It is also implicit within the policy that the cost of supplementation must be weighed against the benefits of so doing. The defendant's expert mentioned a number of methods of supplementing the source list, but there was no specific testimony as to the costs involved or how successful these methods would be in reducing the underrepresentation. It is specifically noted that statutory policy is not fostered where excessive costs are required to obtain minimal increases in representation.

In light of the cost considerations it would not be prudent to supplement the present master wheel which is at the tail end of its use. According to the plan the master wheel will be refilled by September 1, 1981. It is possible that the voter regis-

---

13. Congressional history is consistent. "In a sense the use of voter lists as the basic source of juror names discriminates against those who have the requisite qualifications for jury service but who do not register to vote. This is not unfair, however, because anyone with minimal qualifications–qualifications that are relevant to jury service–can cause his name to be placed on the lists simply by registering or voting. No economic or social characteristics prevent one who wants to be considered for jury service from having his name placed in the pool from which jurors are selected." H.R. Rep.No.1076, 90th Cong., 2nd Sess. (1968) reprinted in 1968 U.S.Code Congressional and Administrative News, pp. 1792, 1794.

tration list will be more representative of the eligible population than it was in 1977. Furthermore, the 1980 census will be available for making this determination. It is strongly recommended that a careful analysis of the forthcoming JS–12's be made to determine whether blacks continue to be significantly underrepresented in the Broward Division. In accordance with the plan that analysis should be done by the Clerk of the Court and if necessary there should be consultation with experts in the field. Under the plan the decision to supplement is made by the Chief Judge of this District. This Court would seriously recommend supplementing the 1981 master wheel if there continues to be a significant statistical underrepresentation of blacks and if the cost of supplementation does not seriously outweigh any possible benefits.

Accordingly, it is

ORDERED and ADJUDGED that the defendants' motion to stay proceedings pending selection of a petit jury venire in conformity with the Jury Selection and Service Act is denied. The alternative relief, transferring the trial to Miami, is denied.