**James WALLER, et al., Plaintiffs,**

v.

**Bernard BUTKOVICH, et al., Defendants.**

**Civ. A. No. 80–605–G.**

United States District Court, M.D. North Carolina, Greensboro Division.

Sept. 4, 1984.

P. Lewis Pitts, Jr., Greensboro, N.C., Carolyn McAllaster, Durham, N.C., Dan Sheehan, Washington, D.C., Stewart Kwoh, Legal Alliance for G'bo Justice, Kwoh & Ono, Los Angeles, Cal., Flint Taylor, Michael Deutsch; People's Law Office, Chicago, Ill., Jim McNamara, Columbus, Ohio, Burt Neuborne, Amer. Civ. Liberties, New York City, for plaintiffs.

Virgil Griffin, David Wayne Matthews, Lawrence Gene Morgan, Edward W. Dawson, Rayford Milano Caudle, Jack Wilson Fowler, Jr., Harold Covington, Gorrell Pierce, Mark Sherer, Coleman Blair Pridmore, Lisford Carl Nappier, Sr., Jerry Paul Smith, Michael Eugene Clinton, Roy Clinton Toney, Roland Wayne Wood, Claude Matthew McBride Jr., pro se.

Charles E. Nichols, Fred T. Hamlet, Kenneth Kyre, Jr., Jesse L. Warren, City Atty., Greensboro, N.C., R. Joseph Sher, Asst. Director Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Kenneth W. McAllister, U.S. Atty., Greensboro, N.C., for defendants.

## MEMORANDUM AND ORDER

MERHIGE, District Judge.

■ Plaintiffs have applied to the Court for permission to appeal, pursuant to 28 U.S.C. § 1292(b), this Court's order of July 11, 1984. That order denied plaintiffs' motion to stay trial proceedings in this case. Plaintiffs based their motion to stay on the grounds that the jury plan now in effect in the Middle District of North Carolina substantially underrepresents black people in the district.

In addition to plaintiffs' materials, two *amicus* briefs have been submitted in support of the plaintiffs' application. A number of organizations and individuals have joined in each brief.[1] Pending before the Court are motions by these groups for permission to file the two already-submitted *amicus* briefs. The Court will direct the filing of the briefs in support of the application.

The Court has carefully considered plaintiffs' application, their supporting memorandum, and the briefs of *amici*. It has also reviewed plaintiffs' memorandum in support of their prior motion to stay the trial proceedings. In addition, the Court has considered more recent data about the proportion in the various stages of the jury selection process. Having thoroughly considered the relevant facts, statutes, and case law, the Court must deny plaintiffs' application for the reasons stated below.

*Background*

Plaintiffs filed a motion to stay the trial proceedings (hereinafter "Motion to Stay"), pursuant to 28 U.S.C. § 1867(c), on July 2,

1. One brief (hereinafter "the Guild Brief") was submitted by the North Carolina Chapter of the National Lawyers Guild, the Minority Student Association of the Medical College of Virginia, Women's Strike for Peace and the Worker's Rights and Action Committee.

A second brief (hereinafter the "Black Caucus Brief") was submitted by the Congressional Black Caucus, National Council of the Churches in the U.S.A., the Southern Organizing Committee for Economic and Social Justice, the Hon. Ronald Dellums, M.C., the Union of American Hebrew Congregations, the National Black Law Student Association, the National Conference of Black Lawyers, the New Jewish Agenda, the General Board of Church and Society, the National Emergency Civil Liberties Committee, the Black American Law Student, Inc., Asian Americans for Equality, Gerald Cunningham of the Christian Church (Disciples of Christ), the General Board of Church and Society, United Methodist Church, National Anti-Klan Network, Mexican-American Legal Defense and Education Fund, Bob Alpern, Director, Unitarian Universalist Association of Churches in North America, the Hon. Mickey Leland, M.C., and the Commission for Racial Justice of the United Church of Christ.

1984. They complained in their motion that the jury selection plan for the Middle District of North Carolina impermissibly underrepresents black people; thus, they sought the modification of the current jury selection plan to correct for the alleged underrepresentation prior to the selection of a petit jury in this case. The legal basis for plaintiffs' claims was primarily two sections of the Jury Selection and Service Act, codified at 28 U.S.C. §§ 1861, 1982. Although plaintiffs also alluded to the due process clause of the Fifth Amendment and the trial-by-jury clause of the Seventh Amendment in their motion, *see* Motion to Stay, ¶ 9, their memorandum addressed itself exclusively to their Jury Selection and Service Act claim.

Plaintiffs' memorandum presented various statistics to describe the extent to which black people are underrepresented in the Middle District's jury selection process. Their statistics were based on a study conducted by Dr. John Ruoff, whose research specialties include advanced work in demography. His study relied on three sources: the U.S. Census (for the racial composition of the voting-aged population of the Middle District); a 1980 report on registration statistics prepared by the Executive Secretary-Director of the North Carolina State Board of Elections (for the racial composition of voter registration lists in the Middle District); and the Court's JS–12 report dated December 31, 1981 (for the racial composition of potential jurors).

Plaintiffs have presented statistics about the proportion of non-whites in various phases of the juror selection process in order to compare those proportions with the proportion of non-whites in the population who are age-eligible to vote. A brief description of the relevant phases of the Middle District's plan helps to place these statistics in context. This description is based on the Middle District's "Plan for Random Selection of Jurors," approved by the Reviewing Panel on January 29, 1981, amended February 14, 1983 (the "Jury Plan"). *See* APPENDIX "A." At least once every four years, the District's Clerk compiles a "master jury wheel" from voter registration lists maintained by each of the counties in the Middle District. *See* Jury Plan at (VI)(A)(3). Those voter lists are the official records of persons registered to vote in the most recent national general election. *See id.* at (V)(B). Because the four-year periods commenced in January, 1981, the most recent national general elections will ordinarily be presidential elections. The master jury wheel must include at least one-half of one percent of all voters on the lists. The Clerk selects names from the voter lists for the master jury wheel according to a method designed to ensure randomness. *See id.* at (VI)(B).

From the master jury wheel, the Clerk generates a "qualified jury wheel" periodically, when directed by the Court. *See* Jury Plan at (VI)(C)(1). The Clerk first mails out questionnaires to names selected at random from the master jury wheel. *See id.* at (VI)(C)(1). The Clerk then reviews the returned questionnaires, culling out people who are unqualified, exempted, or excused. *See id.* at (VII)(A). The remaining names constitute the qualified jury wheel. The qualified jury wheel currently in use in the Middle District was generated at least as recently as June, 1983. *See* Memorandum, from J.P. Creekmore (Clerk), to Chief Judge Hiram H. Ward (August 17, 1983) (APPENDIX "B").

According to Dr. Ruoff's study, 19.87% of the population that is age-eligible to vote (hereinafter the "age-eligible population") of the Middle District is "non-white." The proportion of the registered voters in the Middle District that was non-white as of April 8, 1980 was 15.88%. In addition, 14.88% of the sample of registered voters selected on July 6, 1981 from the master jury wheel to whom questionnaires were sent was non-white. Finally, 13.60% of the qualified jury wheel, as of December 31, 1981, was non-white.

Plaintiffs provided other statistics from the Ruoff study as well, concerning absolute disparities, comparative disparities,

and standard deviations.[2] Table A, below, shows some of the most significant statistics that plaintiffs use in their argument for impermissible underrepresentation.

TABLE A:

Plaintiffs' statistics concerning disparities in the Middle District of North Carolina between the percentage of non-whites who are age-eligible to vote and the percentage of non-whites at various stages of the jury selection process (1981).

| Level of Analysis | Total Number of People in Level of Analysis | % of Non-Whites in Level of Analysis | Absolute Disparity | Comparative Disparity | Standard Deviations |
|---|---|---|---|---|---|
| People who are age-eligible to vote: | 1,347,097 | 19.87% | — | — | — |
| People who are registered voters: | 856,126 | 15.88% | −3.99% | −20.07% | 92.49 |
| People who were mailed jury questionnaires: | 3,341 | 14.88% | −4.99% | −25.13% | 7.23 |
| People who were on qualified jury wheel: | 2,250 | 13.60% | −6.27% | −31.55% | 7.45 |

The plaintiffs also briefly discussed, in their Memorandum Supporting the Motion to Stay, two facts relating to discrimination against blacks in North Carolina in the voter registration process. First, plaintiffs referred to findings by a three-judge district court in *Gingles v. Edmisten*, 590 F.Supp. 345 (E.D.N.C.1984), *appeal pending*. The three-judge court in *Gingles* set aside portions of North Carolina's legislative reapportionment on the basis of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. The Court also made express findings of past discrimination and its continuing effects in the form of relatively depressed levels of black voter registration, with respect to two of the twenty-four counties in the Middle District. Second, plaintiffs note that seven other counties in the Middle District are designated for coverage under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, "because of their use of discriminatory literary tests for voting and their continuing low levels of voter registration or voter turnout." Memorandum in Support of Motion to Stay, at 9. The plaintiffs do not appear to claim that intentional discrimination

**2.** Useful explanations of these three statistical terms are in Kairys, Kadane, & Lehoczky, *Jury Representativeness: A Mandate for Multiple Source Lists*, 65 Cal. 2 Rev. 776, 788–93 (1977).

Throughout this opinion, there are references to these three types of statistics. Indeed, the Court occasionally (and painfully) computed statistics itself. The Court always used the following standard formulas, which were the same formulas that plaintiffs' expert used, to compute these statistics.

Where p = proportion in the basis of comparison,

j = proportion in the group under examinations, and

n = number of persons in group under examination:

Absolute disparity = $j-p$;

Comparative disparity = $\dfrac{j-p}{p}$

Standard deviations = $\dfrac{(p-j)n}{\sqrt{np(1-p)}}$.

against blacks in voter registration continues.[3] In any event, plaintiffs did not focus on supporting a claim of intentional discrimination, past or present; and little if any of their legal argument is based on such claims.

In a two-page order, this Court, on July 11, 1984, denied plaintiffs' Motion to Stay. On August 7, plaintiffs filed the instant application for permission to appeal the order.

In order to better evaluate plaintiffs' assertions of underrepresentation, the Court also considered more recent data on the disparities involved. The Clerk's Office of the Middle District of North Carolina furnished data on the proportion of blacks in various stages of the jury selection process based on the Middle District's qualified jury wheel, which was assembled between February and June of 1983. The Clerk's Office also furnished data, based on the 1980 census, on the proportion of voting-aged blacks in the total population of the Middle District. This data is more accurate than that tendered by plaintiffs, in two important ways. First, the information concerning jury selection is more recent by two years. Second, all the information is more relevant than plaintiffs' data to plaintiffs' claim of underrepresentation of blacks, because its data is directly about blacks (by contrast, plaintiffs' preferred data is about "non-whites" and is simply a surrogate for blacks).

This most recent data is assembled in Table B, which follows. The data reveals disparities somewhat smaller than those in Dr. Ruoff's study on which the plaintiffs rely.

TABLE B:

Clerk's Office statistics concerning disparities in the Middle District of North Carolina between the percentage of blacks who are age-eligible to vote and the percentage of blacks at various stages of the jury selection process (August 1983).

| Level of Analysis | Total Number of People in Level of Analysis | % of Blacks in Level of Analysis | Absolute Disparity | Comparative Disparity | Standard Deviations |
|---|---|---|---|---|---|
| People who are age-eligible to vote: | (not provided) | 19.06% | — | — | — |
| People who are registered voters: | (not provided) | 15.50% | —3.56% | —18.68% | (cannot be computed with data provided). |
| People who were mailed jury questionnaires: | 5,013 | 15.36% | —3.70% | —19.41% | 6.67 |
| People who are on Qualified Jury Wheel: | 3,079 | 14.62% | —4.44% | —23.29% | 6.29 |

*Discussion.*

I. *Appeal Under 28 U.S.C. § 1292(b).*

To grant permission to appeal under 28 U.S.C. § 1292(b), the Court must:

> ... be of the opinion that such order involves a controlling question of law as

**3.** Plaintiffs' Motion to Stay asserts only that there are "residual" effects from a history of official discrimination in registering and voting in the Middle District. Motion to Stay, ¶ 10.

Their Memorandum in Support of the Motion to Stay does, at one point, state that this is a "past and continuing" discrimination in "registering and voting." *See* Memorandum in Support of Motion to Stay, at 8. But the two facts that plaintiffs discuss in their memorandum, however, do not show that discrimination is continuing.

to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation....

The Court assumes for the purposes of decision that the question of the representativeness of the Middle District's jury plan is a controlling one. Nevertheless, the Court must also find that there is substantial ground for difference of opinion on the question, and that an immediate appeal from the Court's challenged order may materially advance the ultimate termination of the suit. After a careful review of the case law, the Court, for the reasons which follow, strongly believes that there is no substantial ground for difference of opinion on the question. Having so concluded, granting permission to appeal would be a dereliction of the Court's responsibility. Further, this lawsuit's just and already long delayed resolution will very likely be significantly advanced by denying permission to appeal at this stage. The parties and several non-party government agencies are currently intensely involved in pre-trial discovery. Appealing the jury selection plan now would interrupt their discovery proceedings and distract the parties and their counsel from the issues of privilege and relevance. They have spent much time becoming familiar with the law and the facts relating to these issues here. The pace of discovery and the fact-finding process would suffer if permission to appeal now were granted. Given the Court's conviction that the jury selection plan is clearly not unlawful, an appeal on the issue now would undermine the imminent resolution of this suit both by consuming time in the appeal itself and by interrupting the intense discovery currently underway.

## II. *Violation of the Jury Selection and Service Act*

### A. *Overview of the Jury Selection and Service Act.*

The Jury Selection and Service Act (hereinafter "the Act") states, in pertinent part, that:

It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.

28 U.S.C. § 1861. The Act further states that "no citizen shall be excluded" from juror service in the federal district courts "on account of race, color, religion, sex, national origin, or economic status." 28 U.S.C. § 1862. The Act also provides that the names of prospective jurors "shall be selected from the voter registration lists or the lists of actual voters of the political subdivisions within the district or division." 28 U.S.C. § 1863(b)(2). However, it also requires that a district's or division's jury selection plan prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title. *Id.* These rights include the one at issue here: the right to a petit jury selected from a "fair cross section of the community."

The Act gives civil litigants a right of enforcement. 28 U.S.C. § 1867(c). Through that subsection, any party acting in a timely fashion may move to stay proceedings on the ground of "substantial failure to comply with the provisions of this title in selecting the petit jury." *Id.* Thus, plaintiffs here contend that the Middle District's plan substantially fails to provide a fair cross section of the community from which jurors can be drawn because of the underrepresentation of blacks on voter registration lists, and that the plan therefore also substantially fails to prevent the exclusion of blacks from jury service on account of their race.

### B. *Discriminatory Intent.*

■ Plaintiffs correctly maintained, in their Memorandum in Support of Motion to Stay (hereinafter "plaintiffs' Memorandum"), that intentional discrimination in the jury selection process is not required in order to establish a claim based on the Act.

As many courts have held, the Act's fair-cross-section requirement establishes the same standards, in terms of securing federal juries from a "fair cross section of the community," as the Sixth Amendment establishes for criminal defendants. *See, e.g., United States v. Test*, 550 F.2d 577, 584–85 (10th Cir.1976) (en banc) (discussing the basis, in both the case law and the legislative history of the Act, for that assumption); *United States v. Blair*, 493 F.Supp. 398, 405–06 (D.Md. 1980), *aff'd*, 665 F.2d 500 (4th Cir.1981). And the Supreme Court has held, in the context of the Sixth Amendment fair-cross-section requirement, that discriminatory intent is unnecessary to establish a violation. *Duren v. Missouri*, 439 U.S. 357, 368 n. 26, 99 S.Ct. 664, 670 n. 26, 58 L.Ed.2d 579 (1979). The Supreme Court in *Duren* distinguished equal protection cases, where discriminatory intent must be shown, from Sixth Amendment fair- cross-section cases. Under the Sixth Amendment, "systematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section." *Id.* Given the equivalence of the fair cross section requirement of the Sixth Amendment and the Act, it follows that discriminatory intent need not be shown in order to establish a violation of the Act. At least one court reached this conclusion even before *Duren*. *See United States v. McDaniels*, 370 F.Supp. 298, 301 (E.D.La. 1973), *aff'd sub nom United States v. Goff*, 509 F.2d 825 (5th Cir.), *cert. denied*, 423 U.S. 857, 96 S.Ct. 109, 46 L.Ed.2d 83 (1975).

### C. *Elements of a Jury Selection and Service Act Claim.*

The Supreme Court in *Duren* clearly set out the three elements of a *prima facie* case for violation of the fair-cross section requirement of the Sixth Amendment. Those elements are:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. at 364, 99 S.Ct. at 668. As previously discussed, the Act creates the same standard for what constitutes a fair cross section of the community as the Sixth Amendment. Thus, the *Duren* test for violations of the fair cross section standard is appropriate for claims based on violations of the Act's fair cross section requirement.

### 1. *Distinctive Group in the Community.*

A fair-cross-section violation requires that the underrepresentation involve a "'distinctive' group in the community," according to *Duren*. 439 U.S. at 364, 99 S.Ct. at 668. The Court of Appeals for the Tenth Circuit has formulated the following test to determine whether a group is "distinctive":

(1) the presence of some quality or attribute which defines and limits the group; (2) a cohesiveness of 'attitudes or ideas or experience' which distinguishes the group from the general social milieu; and (3) a "community of interest" which may not be represented by other segments of society.

*U.S. v. Test, supra*, 550 F.2d at 591. Blacks in the Middle District of North Carolina easily satisfy these standards. Their color, their common history of *de facto* and *de jure* segregation, and their continuing efforts to overcome the effects of that discrimination, need only be mentioned. In addition, at least one other court in this circuit has assumed that blacks are a "distinctive group" for purposes of fair-cross-section analysis. *See U.S. v. Blair, supra*, 493 F.Supp. at 407.

### 2. *Fair and Reasonable Representation.*

The second element of a *prima facie* case for violation of the fair-cross-section is that the "representation of [the distinctive group] in venires from which juries

are selected is not fair and reasonable in relation to the size of the group in the community." *Duren*, 439 U.S. at 364, 99 S.Ct. at 668. Thus, the next question in this case is to determine whether the representation of blacks on the voter registration lists and qualified jury wheel is fair and reasonable in relation to their number in the community.[4]

Plaintiffs have submitted a variety of statistics, many of which were introduced in the "Background" section of this memorandum, *supra*, to support their claim that the Middle District's plan does not fairly and reasonably represent black people. Plaintiffs' statistics are not, however, for blacks. Rather, they are for "non-whites." While "non-whites" may not be a distinctive group for purposes of underrepresentation of claims brought under the Sixth Amendment and the Act, the Court considers plaintiffs' statistical representations here about non-whites as a surrogate for statistical representations about blacks. According to the affidavit of plaintiffs' statistician, "Indians and Others represent only 4% of the Non-White population of the Middle District." Affidavit of John C. Ruoff (hereinafter "Ruoff Affidavit"), at 2, note. The court accepts Dr. Ruoff's conclusion that "references to non-whites are essentially references to Black people." *Id.* Assuming that blacks constitute the

same percentage of the other categories about which plaintiffs have submitted statistics (that is, "registered voters," "people to whom questionnaire samples were mailed," and "qualified jury wheel"), then the computations of absolute disparity, comparative disparity, and standard deviation should be accurate. For purposes of discussion, the Court makes this assumption and treats all of plaintiffs' statistics about non-whites as reasonably accurate statistics about blacks.[5]

### a. *Review of Disparities in Other Cases.*

To place the plaintiffs' claim of substantial underrepresentation in context, the Court has reviewed the statistics in a large number of cases, including cases found through the Court's research as well as cases cited by plaintiffs and *amici*, that involve claims (based on the Sixth Amendment, the Jury Selection Act or both) of substantial underrepresentation. A striking fact about this review is that not a single court, state or federal, has concluded that a substantial underrepresentation existed where statistics such as those in this case have been mustered. Indeed, those cases include several where the disparities were greater in all respects than the disparities alleged here.

---

**4.** The *Duren* formulation by its terms applies to underrepresentation in the "jury venires," which was the sort of underrepresentation at issue in that case. Here, however, the underrepresentation about which plaintiffs complain is at the level of the voter registration lists and the qualified jury wheel. The difference is immaterial, though. The policy that *Duren* aims to effectuate is "fair and reasonable" representation of distinctive groups throughout the jury selection process:

"... petit juries must be drawn from a source fairly representative of the community.... ... jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof."

*Duren*, 439 U.S. at 363–64, 99 S.Ct. at 668–69, citing *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975).

**5.** Dr. Ruoff noted in his affidavit that the U.S. Census has historically under-counted blacks,

and that estimates by the Bureau of the Census suggest that blacks were under-counted by 6.5%. Ruoff Affidavit, at 3. Dr. Ruoff extrapolates an "adjusted" population figure for blacks in the Middle District by increasing the non-white population by 6.5%, and re-computes the disparities in his study, which become greater because of the larger base population figure for blacks.

This approach seems inappropriate, however, because the non-white population figure already includes people who are not black. It would seem that any adjustments of the base population figure, for purposes of more accurately reflecting the black population in the Middle District, would involve a subtracting out of the people in the non-white census figures who are not black, as well as an adding in of the blacks who were presumably not counted in the census.

In any case, however, plaintiffs do not use Dr. Ruoff's "adjusted statistics" in their arguments.

In *United States v. Goff*, 509 F.2d 825, 826 (5th Cir.), *cert. denied*, 423 U.S. 857, 96 S.Ct. 109, 46 L.Ed.2d 83 (1975), the jury selection plan for the Eastern District of Louisiana was upheld against a challenge based on the Act. The District relied on voter registration lists as its source of jurors. The challengers asserted that blacks were substantially underrepresented on the lists. Blacks constituted 26.33% of the voting age population in the District, but only 21.06% of the registered voters there. Accordingly, the absolute disparity was 5.27%, and the comparative disparity was –20.02%. The Fifth Circuit in *Goff* nevertheless affirmed the district court's conclusion that the voter registration lists did not illegally underrepresent blacks.

In *U.S. v. Facchiano*, 500 F.Supp. 896, (S.D.Fla.1980), the jury selection plan for the Southern District of Florida (Fort Lauderdale Division) was challenged. The plan relied exclusively on voter registration lists as the source of jurors. Blacks constituted 11.3% of the Division's population, but only 3.7% of the sample from the master wheel. (The case report does not indicate the percentage of blacks among registered voters.) 500 F.Supp. at 898. The resulting absolute disparity was 7.6%, and the comparative disparity was –67.3%. Yet, the Court held that such underrepresentation was not so substantial as to be unfair, for Sixth Amendment purposes. *Id.* at 899. The court did go on to suggest, however, that disparities of this magnitude might in some circumstances be enough to trigger the duty, under the Act, of supplementing voter lists as juror sources. *Id.* at 903.

In *United States v. Test, supra*, 550 F.2d 577, the Colorado jury selection plan was challenged. As in *Goff* and *Facchiano*, the challenge included a claim, based on the Act, that distinctive groups ("Chicanos" in *Test*, as well as blacks) were unfairly underrepresented in voter registration lists. 550 F.2d at 581–82. Those lists were the "primary" source of jurors. *Id.* at 582. In the Grand Junction Division, 8.89% of the population was Chicano, while only 4.81% of those who returned questionnaires were Chicanos. (The case report does not provide the percentage of Chicanos on the voter registration lists.) *Id.* at 583. The resulting absolute disparity was 4.08%. The comparative disparity was –46%. *Id.* at 589 (chart). The Court of appeals for the Tenth Circuit, *en banc*, rejected the argument that these figures established any substantial departure from a fair cross section of the community. *Id.* at 589.

Table C, below, compares the statistics in *Goff, Facchiano* and *Test* with the statistics in this case.

TABLE C:

Comparison of disparities in <u>Waller</u> with disparities in other fair-cross-section cases where no substantial underrepresentation was found.

| Case | Distinctive Group in Population (%) | Distinctive Group Registered to Voters (%) | Absolute Disparity (%) | Comparative Disparity (%) |
|---|---|---|---|---|
| <u>Waller</u>: (plaintiffs' statistics) | 19.87 | 15.88 | −3.99 | −20.07 |
| | | 13.60 [a] | −6.27 | −31.55 |
| <u>Goff</u>: | 26.33 | 21.06 | −5.27 | −20.02 |
| <u>Facchiano</u>: | 11.3 | 3.7 [b] | −7.6 | −67.3 |
| <u>Test</u>: | 8.89 | 4.08 [c] | −4.81 | −46 |

[a] This percentage expresses the proportion of the distinctive group in the qualified juror wheel, rather than the proportion registered to vote.

[b] This percentage expresses the proportion of the distinctive group in the sample of the master wheel, rather than the proportion registered to vote.

[c] This percentage expresses the proportion of the distinctive group returning questionnaires, rather than the proportion registered to vote.

As Table C shows, the disparities involved in this case are on the same order as the disparities in the three cases discussed above. Indeed, even plaintiffs' statistical measures of the disparities between non-whites in the population and non-whites on the voter registration lists show less disparity in this case than in any of the three other cases, except that the comparative disparity here is a shade higher than that in *Goff.* Even upon considering plaintiffs' level of analysis that has the greatest disparity here (comparing the percentage of non-whites in the voting-age population with the percentage of non-whites on the qualified jury wheel), the resulting absolute and comparative disparities are within the range set by these cases.

To further place plaintiffs' statistical evidence in context, the Court has considered cases where the fair- cross-section requirement in the juror pool has been held violated. In *Duren v. Missouri,* 439 U.S. at 362, 99 S.Ct. at 667, the Supreme Court found the fair-cross-section requirement of the Sixth Amendment violated where 26.7% of persons summoned—and only 14.5% of persons on the postsummons weekly venires—were women, even though women constituted 54% of the adult population. The absolute disparity is 27.3%, and the comparative disparity is –51%, computed at the level of persons summoned. (Of course, these disparities are even greater when computed for the percentage of women on the postsummons weekly venires).

In a more recent federal case, the Court of Appeals for the First Circuit found that where a group constituted 38.4% of the population but only 13.5% of the grand juries and 10.8% of the petit jury venires, the fair- cross-section requirement was also violated. *LaRoche v. Perrin,* 718 F.2d 500, 502–04 (1st Cir.1983). Thus, the case presented an absolute disparity of 24.9% and a comparative disparity of 64.8% (computed at the level of grand jury venires).

Finally, in *People v. Harris,* 36 Cal.3d 36, 201 Cal.Rptr. 782, 679 P.2d 433 (Cal.1984), the California Supreme Court found the fair- cross-section requirement of both the United States and California Constitutions violated by the jury selection procedure of Los Angeles County. The County's procedure used only voter registration lists as the juror source. The black population of the County was 12.6% and the Hispanic population was 27.6% according to the 1980 census. *Id.* 201 Cal.Rptr. at 787, 679 P.2d at 438. But of the potential jurors appearing at the courthouses over a three-and-one-half month period of 1979, only 5.5% were black and only 3.4% were Hispanic. *Id.* This meant, for blacks, an absolute disparity of 7.1% and a comparative disparity of 56.3%; for Hispanics, the absolute disparity was 24.2% and the comparative disparity was 87.7%.

This review of the disparities in cases where the fair-cross-section requirement has been violated [6] suggests that the dis-

---

**6.** The Court has also reviewed cases in which "substantial underrepresentation" in jury pools, venires, or juries themselves, was found in the context of equal protection claims. The disparities in those cases too are much greater, by any percentage measures, than the disparities here. *See Stephens v. Cox,* 449 F.2d 657, 659 (4th Cir.1971); *Quadra v. Superior Court of San Francisco,* 403 F.Supp. 486, 495–96 (N.D.Cal. 1975); *Sanford v. Hutto,* 394 F.Supp. 1278, 1281–82 (E.D.Ark.), *aff'd,* 523 F.2d 1383 (8th Cir.1975); *Ford v. Hollowell,* 385 F.Supp. 1392, 1396–98 (N.D.Miss.1974).

The chart below summarizes the disparities in those cases. Note that all these statistics were not always presented in each case report; where the report did not include some of the measures listed below, the Court has computed them to facilitate comparisons.

**SUBSTANTIAL UNDERREPRESENTA-TION IN EQUAL PROTECTION CLAIMS:** Comparison of the extent of underrepresentations found substantial in equal protection challenges to juries or jury selection processes, and the extent of underrepresentation in this case.

parities presented here are on a different order altogether. Table D, below, summa-rizes the statistics to facilitate their comparison.

TABLE D:

Comparison of disparities in Waller with disparities in cases where substantial underrepresentation has been found.

| Case | Distinctive Group in Population (%) | Distinctive Group on Voter Registration Lists (%) | Absolute Disparity (%) | Comparative Disparity (%) |
|---|---|---|---|---|
| Waller: | 19.87 | 15.88 | −3.99 | −20.07 |
| (plaintiffs' statistics) | | 13.60 [c] | −6.27 | −31.55 |
| Duren: | 54 | 26.7 [d] | −27.3 | −51 |
| LaRoche: | 38.4 | 13.5 [e] | −24.9 | −64.3 |
| Harris: | 27.6 [a] | 3.4 [f] | −24.2 | −56.3 |
| | 12.6 [b] | 5.5 [f] | −7.1 | −87.7 |

[a] Hispanics

[b] Black

[c] Proportion of distinctive group on qualified jury wheel

[d] Proportion of distinctive group summoned

[e] Proportion of distinctive group on grand juries

[f] Proportion of distinctive group appearing at courthouse as potential jurors.

A quick review of Table D shows that in each of the three cases—including *Harris*, which the Black Caucus Brief calls to the Court's attention—the comparative disparities involved were nearly double those involved here; and in some instances more. Further, the absolute disparities were almost always *triple* those involved here, except for the blacks in *Harris*. Plaintiffs have not provided, and the Court has been unable to find, any cases where disparities such as those presented to the Court here have been held to constitute "substantial underrepresentation," much less a violation of the fair-cross-section requirement.

| Case | Group in Population(%) | Group in Jury Selection Process(%) | Absolute Disparity(%) | Comparative Disparity(%) |
|---|---|---|---|---|
| Waller | 19.87 | 15.88 [b] | −3.99 | −20.07 |
| (plaintiffs' statistics) | | 13.60 [c] | −6.33 | −31.55 |
| Stephens | 30 | 15 [d] | −15 | −50 |
| Quadra: | | | | |
| —Non-white Ethnic Minorities: | 38.8 | 23.95 [e] | −14.85 | −38.27 |
| —Women | 52.4 | 23.60 [c] | −28.90 | −54.96 |
| Sanford | 25.2 | 11.7 [f] | −13.3 | −53.2 |
| Ford | 19 | 7.24 [g] | −11.86 | −63 |

a This was the lowest estimated proportion of blacks on the voting lists, not in the population. The *Sanford* court focuses on the disparity between the proportion of blacks on voting lists and the proportion of jury venires, not the disparity between blacks in the population at large and jury venires.

b Percentage of blacks on voter registration lists.

c Percentage of blacks on qualified jury wheel.

d Average percentage of blacks in six venires in year in question.

e Average percentages of these groups, nominees to grand jury panels, over six-year period.

f Average proportion of blacks on jury venires over four-year period.

g Highest proportion of blacks on jury venire lists over a several-year period.

b Black

c Proportion of distinctive group on qualified jury wheel

d Proportion of distinctive group summoned

e Proportion of distinctive group on grand juries

f Proportion of distinctive group appearing at courthouse as potential jurors.

b. *Standards for Determining Underrepresentation.*

(i) *Absolute disparity.* Some courts have focused solely on the absolute disparity involved, insisting on an absolute disparity of at least 10% to establish a *prima facie* case of substantial underrepresentation. *See, e.g., United States v. Butler,* 611 F.2d 1066, 1070 (5th Cir.) *cert. denied sub nom. Fazio v. U.S.,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980); *United States v. Maskeny,* 609 F.2d 183, 190 (5th Cir.), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); *U.S. v. Test, supra,* 550 F.2d at 587. The standard of 10% derives from *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). *Swain* was an equal protection challenge based on the alleged abridgement of blacks' rights to participate in the justice system as jurors. The petitioners had to prove purposeful discrimination against blacks in their participation as jurors. The evidence included a showing that, while the population of black males over 21 was about 26%, only 10% to 15% of the grand and petit jury panels over time had been black. The Supreme Court held that "we cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%." *Id.* at 208–09, 85 S.Ct. at 829–30. Thus, in *Swain* the issue was whether an absolute disparity of 10% established purposeful discrimination—not whether, as here, an unfair cross section was used. A fair-cross-section claim does not require a showing of discriminatory intent. Several courts have acknowledged this distinction, but have applied the 10% absolute-disparity standard anyway. *See, e.g., United States v. Maskeny, supra,* 609 F.2d at 190. The panel in *Maskeny* defended its use of the 10% absolute disparity figure from *Swain* as its benchmark, by referring to *Duren:* the panel explained that in *Duren,* which established that discriminatory intent is unnecessary in a fair cross section claim, the Supreme Court did not indicate that the disparity needed to show substantial underrepresentation for Sixth Amendment purposes was any different from that needed to show discriminatory intent for equal protection claims, even though the Court discussed both equal protection and Sixth Amendment violations. 609 F.2d at 190. This line of reasoning does not persuade this Court, however. Whether a fair cross section exists is entirely different from whether intentional discrimination occurred. Further, adopting the 10% absolute disparity rule would have the effect of legitimizing the total or near exclusion from the jury pool of groups constituting 10% or less of the voter-eligible population. This Court does not adopt the 10% absolute-disparity rule in concluding that no substantial underrepresentation of blacks has been shown in the Middle District's plan.

(ii) *Standard Deviation Analysis (Statistical Significance).* Plaintiffs and one set of *amici* insist that the Court of Appeals for the Fourth Circuit has established a standard deviation analysis (also known as a statistical significance test) for determining whether underrepresentation in juror sources is substantial. They rely on *Moultrie v. Martin,* 690 F.2d 1078 (4th Cir.1982). The case involved a *habeas corpus* challenge to a state-imposed prison sentence. The petition was based on an alleged equal protection violation, in that blacks were underrepresented on the grand jury that indicted the petitioner. The petitioner's evidence consisted entirely of statistics comparing the proportion of blacks in the county's population with the proportion of blacks actually on county grand juries. 690 F.2d at 1081–82. The comparisons showed "underrepresentations between 8% and 41% over the 1971–77 period, with an average of 22%." *Id.* at 1082. The Court refused to consider these percentages as evidence of disparity, however. That refusal was premised on a careful consideration of statistical principles governing hypothesis-testing. One important principle that the Court focused on is that "the precision and dependability of statistics is directly related to the size of the sample beign evaluated." *Id.* at 1083. Ap-

plying a standard deviation analysis, the *Moultrie* court rejected the statistical showing as any indication of underrepresentation. The samples in which the alleged underrepresentation appeared were so small that they could easily reflect random deviations in every year except 1971, according to commonly applied statistical standards. The appropriate statistical standard, the *Moultrie* court indicated, is 2 or 3 standard deviations. *Id.* at 1084.

■ Plaintiffs and one of the *amici* have focused on the "2 or 3 standard deviations" as the critical figure for the Fourth Circuit in underrepresentation claims. They point out that standard deviations here range from 92.49 (blacks on voting lists compared to blacks in age-eligible population) to 7.45 (qualified black jurors compared to blacks in age-eligible population). Because these numbers are well above the 2–3 standard deviations discussed in *Moultrie*, they conclude that they have made out a *prima facie* case of substantial underrepresentation. But this is not the lesson of *Moultrie*. Although the court in *Moultrie* did not pursue its statistical analysis of the alleged underrepresentation beyond the stage of considering the standard deviations involved, comparing the standard deviations is only the starting point of a proper analysis of a claim of substantial underrepresentation. A high standard deviation for an "underrepresentative" distribution of a given sample indicates only that the chances of such an underrepresentative distribution, in a sample of that size, being randomly selected are very small. It is not a useful indicator of the *magnitude* of the underrepresentation, however.

■ As one law review article has pointed out, standard deviation varies considerably with sample size. *See* Kairys, Kadane, and Lehoczky, *Jury Representativeness: A Mandate for Multiple Source Lists*, 65 Cal.L.Rev. 776, 794, 794 n. 101 & 102

(1977). Even small underrepresentations can be statistically significant if the sample size is large enough. This phenomenon can be dramatically illustrated by considering what the standard deviation would be in this case for the non-whites among the registered voters (compared to non-whites in the age-eligible population) if 19% of the registered voters were non-white. Recall that 19.87% of the age-eligible population is contended to be non-white. Because the "sample"—all registered voters in the Middle District—is so large (856,126), a standard deviation of 20.17 would exist.[7] This is well above the "two or three standard deviations" that plaintiffs claim establishes a *prima facie* case of substantial underrepresentativeness. It would appear obvious, however, that if 19.0% of a group is on voter registration list where 19.87% of the group is in the age-eligible population, no unfair underrepresentation exists by anyone's standards.

Furthermore, even with sample sizes much smaller than the voter registration lists, the standard deviation test still produces unsatisfactory results. For example, the qualified jury wheel here in plaintiffs' sample included 2,250 people. Even if 16.93% of the people on the Middle District's qualified jury wheel were non-white, the standard deviation would be 3.5, (computed with respect to 19.87% of the age-eligible non-whites in the Middle District). Using the "two or three standard deviations" that plaintiffs insist is the Fourth Circuit's measure of "substantial underrepresentation," such a situation would be "substantially underrepresentative," even though the absolute disparity is only –2.9% and the comparative disparity is only –14.80%.

■ It is inconceivable that the Fourth Circuit, in *Moultrie*, established a test for substantial underrepresentation in jury

**7.** Recall that standard deviation is computed with the following formula:

$$\frac{(p-j)n}{\sqrt{np(1-p)}},$$

where: p=proportion of the distinctive group is the basis for comparison; j=proportion of the distinctive group in the set under examination; and n=number of persons in the set under examination. In the example in the text, p=.1987; j=.1900; and n=856,126.

**956**

source lists that is based solely on statistical significance (standard deviation), given that statistical significance is so easily established where samples are of the size of voter registration lists and qualified jury wheels. A more realistic reading of *Moultrie* is that statistical significance is the first step in analyzing any claims of substantial underrepresentation in juries or juror source lists. Unless statistical significance is established, it is unnecessary for a court to consider percentage disparities in the source lists or jury venire. This is because until statistical significance is shown, one cannot be reasonably certain that any such disparities are not due to random variations. Requiring statistical significance as a threshhold matter, undoubtedly, is especially useful in cases such as *Moultrie*, where a claim of impermissible underrepresentation is based on disparities in very small samples.

This reading of the proper use of standard deviation analysis is supported by the *en banc* decision of the Court of Appeals for the Tenth Circuit in *U.S. v. Test, supra*, 550 F.2d 577. The court there held that:

> the mathematical conclusion that the disparity between ... two figures is "statisticaly significant" does not ... require an *a priori* finding that these deviations are "legally significant."

*Id.* at 584. The court went on to examine the actual percentages of underrepresentation of blacks and Chicanos in jury source pools and concluded that the underrepresentations were not impermissible, even though they were "statistically significant."

In sum, this Court rejects plaintiffs' argument that the Fourth Circuit, in *Moultrie*, established a standard deviations test for determining whether underrepresentation demonstrated by disparities in the voter registration lists and jury wheels are in fact substantial.

(iii) *Totality of Circumstances.* Some cases involve disparities that are so stark, in terms of both absolute and comparative disparities, that substantial underrepresentation is established by simply eye-balling

the disparities. *Duren* was such a case. Women constituted 54% of the community's population, but only 26.7% of the persons summoned and only 14.5% of the post-summons weekly venires were women. 439 U.S. at 362, 99 S.Ct. at 667. Thus the Supreme Court did not face the problem of having to articulate a test of substantial underrepresentation. In other cases it may be just as easy to conclude without analysis that no substantial underrepresentation exists. For example, if a group constitutes 20% of the population but 19% of the jury pool, few if any would argue that the group is substantially underrepresented in the jury pool. There is a large area of middle ground, however, where the disparities are real and yet their substantiality *vel non* cannot be determined instinctively.

 A statistical guideline would be easy to apply and would quickly resolve the fair cross section question. Congress would be the institution that one would expect to fix such a universal statistical guideline. But Congress chose not to specify any such facile statistical test. Indeed, the legislative history shows that Congress committed the question of determining what underrepresentations are "substantial" to the courts:

> The voting list need not perfectly mirror the percentage structures of the community. But any substantial deviations must be corrected by use of supplemental sources. Your committee would leave the definition of substantial to the process of judicial decisions.

S.Rep. No. 891, 90th Cong., 1st Sess. at 17 (1967), *reprinted in U.S. v. Test, supra*, 550 F.2d at 584. Accordingly, this Court considers a variety of factors in deciding whether the disparities shown here, which are almost entirely derived from disparities in voter registration, are "substantial."

First, the Court considers comparative disparity. The Court notes that some courts have rejected any consideration of comparative disparity because where small groups are involved, very small absolute disparities produce large comparative disparities. *See United States v. Jenkins,*

496 F.2d 57, 65 (2d Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). For example, if 5.45% of the population is black but 3.3% of the registered voters are black, a large comparative disparity of −39.45% exists. No such small population is involved here, however.

Plaintiffs show that while 19.87% of the age-eligible population is non-white, only 15.88% of the registered voters in the District are non-white; the resulting comparative disparity is −20.07%. Further, they show that 13.60% of the qualified jury wheel in 1981 was non-white, resulting in comparative disparity of −31.55%. These are not negligible underrepresentations. It means that the likelihood that a non-white who lives in the Middle District will serve as a jury is at least 20.07% less than if the voter registration list fully represented non-whites. One other district judge characterized this underrepresentation as about evenly balanced between "substantial" and "insubstantial," although he ultimately decided that blacks were not underrepresented. *See United States v. McDaniels, supra,* 370 F.Supp. at 304.

Furthermore, several commentators have suggested that comparative disparities of this order should be the demarcation of substantial underrepresentation. *See* Kairys, Kadane, & Lehoczsky, *Jury Representativeness,* 65 Cal.L.Rev. at 799 (15% comparative disparity); J. Van Dyke, *Jury Selection Procedures,* 98 (1977); (20% comparative disparity) *see also* Judge Gewin's Appendix to *Foster v. Sparks,* 506 F.2d 805, 818 (5th Cir.1975), (20% comparative disparity). Their policy recommendations have not been unequivocally adopted by any courts of which this Court is aware, however. The closest thing to adoption of this standard appears in *U.S. v. Facchiano, supra,* 500 F.Supp. at 903 (20% comparative disparity is a "helpful guideline"). Given that the 20.07% comparative disparity between non-whites on voter registration lists and non-whites in the age-eligible population that plaintiffs present here is on the borderline of "substantial underrepresentation" suggested by a number of commentators, the Court has considered other evidence carefully before concluding that substantial underrepresentation does not exist.

The Court notes that plaintiffs' statistics exaggerate the comparative disparities actually involved here. More recent data, directly about blacks rather than about "non-whites," has been provided by the Clerk's Office of the Middle District, as discussed in the "Background" section *supra.* The comparative disparity between registered black voters and age-eligible blacks in the population is only −18.68%, as compared to −20.07% in plaintiffs' older computations for non-whites. Further, the comparative disparity between blacks in the qualified jury wheel and age-eligible blacks in the population is −23.29%, as compared to 31.55% in plaintiffs' older computations for non-whites. These more recent statistics about the black composition of the qualified jury wheel suggest that the comparative disparities at issue here are somewhat smaller than plaintiffs assert.

In any case, comparative disparity is not the sole factor to consider in determining whether the disparities here constitute substantial underrepresentation. A second factor is trends in voter registration, especially where, as here, most of the disparity stems from underrepresentation of blacks on voter registration lists. At least one other court has considered voter registration trends in its determination of whether substantial underrepresentation exists. *See U.S. v. McDaniels, supra,* 370 F.Supp. at 303, 304. Voter registration trends are certainly not dispositive of the question of substantial underrepresentation. But they do help in determining the issue in cases such as this, where the disparity on its face appears to be near the borderline between substantial and insubstantial. In such borderline cases, if voter registration is increasing among the underrepresented group relative to other groups, and if underrepresentation in the voter registration lists is the main source of underrepresentation in the jury selection process, it makes little sense to order the District to supplement its source list with other lists to correct the disparity.

Although the evidence here on voter registration trends is limited, a case cited by

plaintiffs and previously referred to by the Court, does contain some relevant information. In *Gingles v. Edminsten, supra,* at 361, the court recited data on voter registration trends in a number of North Carolina counties. In the state as a whole, as well as in each of the fifteen counties for which information was provided, the proportion of voting-aged blacks registered to vote increased relative to voting-aged whites between October 1978 and October 1982. Two of those counties, Forsyth and Durham, are in the Middle District. The information about these two counties and the state as a whole is reproduced in Table E, below.

### TABLE E

Voter Registration Trends in the State of North Carolina and Two Counties in the Middle District

| | 10/78 | | 10/82 | |
| --- | --- | --- | --- | --- |
| | White(%) | Black(%) | White(%) | Black(%) |
| State | 61.7 | 43.7 | 66.7 | 52.7 |
| Forsyth | 65.8 | 58.7 | 69.4 | 64.1 |
| Durham | 63.0 | 39.4 | 66.0 | 52.9 |

The trend of increasing voter registration among blacks and diminishing disparities between black and white voter registration here contrasts sharply with the trend in *People v. Harris, supra,* 36 Cal.3d 36, 201 Cal.Rptr. 782, 679 P.2d 433, cited by *amici* in the Black Caucus brief. In *Harris,* the Supreme Court of California found that a jury selection plan relying solely on voter registration lists violated the fair-cross-section standard of the Sixth Amendment, (based on comparative disparities ranging from –56.3% (blacks) to –87.7% (Hispanics)). Besides these dramatic disparities—which are, incidentally, much larger than the disparities in this case—the court noted a nationwide trend of *declining* voter registration among blacks and Hispanics from 1972 to 1978, *Id.* at 790, n. 6, not rising voter registration among blacks as exists here.

A third factor bearing on the Court's conclusion that the underrepresentation of blacks here is not substantial is the weight of the case law. As the Court indicated in

its review of cases at the beginning of this discussion of underrepresentation, not a single court has held that disparities such as those here—including even the highest comparative disparity involved here (–31.55%, relating to the proportion of nonwhites on the qualified jury wheel in 1981), which exaggerates the disparity actually at issue in this case, as explained *supra*—constitute substantial underrepresentation. Rather, courts have found disparities that are greater in all respects to be insubstantial. On those occasions where courts did not find underrepresentation to be substantial, the disparities were of a different magnitude altogether than those here. The Court cannot simply ignore the accumulation of judicial experience as to what constitutes "substantial underrepresentation."

Finally, the Court considers the extent to which the District's jury selection plan was reviewed before its adoption. The statute requires that judges of both the District and the Fourth Circuit review the plan before it is implemented. *See* 28 U.S.C. § 1863(a). While this too is not dispositive, it does suggest that a court should at least have "some sense of conviction" before declaring that a district's jury selection plan has substantially failed to comply with the fair-cross-section requirement. *See U.S. v. McDaniels, supra,* 370 F.Supp. at 304. This the Court does not have.

### 3. *Systematic Exclusion*

■ Concluding that there is no substantial underrepresentation here, the Court need not consider the third element of the *Duren* test for fair-cross-section claims. That element is whether the substantial underrepresentation is due to the "systematic exclusion" of blacks in the jury selection process.

An appropriate order will issue.

Appendix A

UNITED STATES COURT OF APPEALS

For the Fourth Circuit
JUDICIAL COUNCIL

In the Matter of the Review of the

Amendment to the Jury Selection Plan submitted by the United States District

Court for the Middle District of North Carolina

Order No. 8

### ORDER

The Jury Selection Plan of the United States District Court for the Middle District of North Carolina is hereby amended by the district court order dated the 14th day of February 1983 and shown in a copy of the order attached hereto, and it is so ordered.

For the Council
s/ Harrison L. Winter
Chief Judge

### IN THE UNITED STATES DISTRICT COURT

### FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### PLAN FOR THE RANDOM SELECTION OF JURORS

Pursuant to 28 U.S.C. § 1863(a),

IT IS ORDERED that the first sentence of Section VII.C. ("Service of Summonses") of this court's Plan for the Random Selection of Jurors is modified and amended to read as follows:

"Each person drawn for jury service may be served personally, or by registered, certified, or first-class mail addressed to such person at his usual residence or business address."

This the 14th day of February, 1983.

s/Hirman H. Ward
Chief Judge
United States District Court

### BEFORE THE REVIEWING PANEL

### OF THE FOURTH CIRCUIT

In the Matter of the Review of the Jury Selection Plan Submitted by the United States District Court for the Middle District of North Carolina

### ORDER

This Reviewing Panel, consisting of the undersigned members of the Judicial Council of the Circuit and the undersigned Chief Judge of the United States District Court for the Middle District of North Carolina, having examined the Jury Selection Plan attached hereto and made a part of this Order, and having ascertained that it complies on all particulars with the Jury Selection and Service Act of 1968, as amended, and the Jury System Improvements Act of 1978, 28 U.S.C. § 1861 et seq., now therefore,

IT IS ORDERED that the said Plan is hereby approved by this Reviewing Panel as of the 29th day of January, 1981.

s/ Clement L. Haynsworth, Jr.
Chief Judge, Fourth Circuit
s/ Harrison L. Winter
United States Circuit Judge
s/ John D. Butzner, Jr.
United States Circuit Judge
s/ Donald Russell
United States Circuit Judge
s/ H. Emory Widener
United States Circuit Judge
s/ K.K. Hall
United States Circuit Judge
s/ James Dickson Phillips
United States Circuit Judge
s/ Francis D. Murnaghan, Jr.
United States Circuit Judge
s/ James M. Sprouse
United States Circuit Judge
s/ Sam J. Ervin, III
United States Circuit Judge
s/ Eugene A. Gordon
Chief Judge, Middle District
of North Carolina

### THE UNITED STATES DISTRICT COURT

### FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### PLAN FOR THE RANDOM SELECTION OF JURORS

I.

### PREAMBLE

Pursuant to the Jury Selection and Service Act of 1968, as amended, and the Jury System Improvements Act of 1978, 28

U.S.C. Section 1861 *et seq.*, (the Act) the following Plan for the Random Selection of Jurors is adopted by this Court superseding the Plan now in effect, subject to approval of this Plan by a reviewing panel of members of the Fourth Judicial Circuit Council and to such rules and regulations as may be adopted from time to time by the Judicial Conference of the United States.

## II.

### DECLARATION OF POLICY

It is the policy of this Court that all litigants in this Court entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community of the Middle District of North Carolina; and that all citizens shall have the opportunity to be considered for service on grand and petit juries, and shall have an obligation to serve as jurors when summoned for that purpose.

## III.

### DISCRIMINATION PROHIBITED

No citizen shall be excluded from service as a grand or petit juror on account of race, color, religion, sex, national origin, or economic status.

## IV.

### MANAGEMENT AND SUPERVISION OF THE JURY SELECTION PROCESS

The Clerk of Court shall manage the jury selection process under the supervision and control of the Honorable Hiram H. Ward, U.S. District Judge, Middle District of North Carolina.

## V.

### VOTER REGISTRATION LISTS AS SOURCE OF NAMES

The Court finds that the persons whose names appear on the voter registration lists in the twenty-four counties comprising this District (on and after October 1, 1981) represent a fair cross section of the community. The procedures prescribed in this Plan to be followed in selecting names from voter registration lists are designed to ensure the random selection of a fair cross section of the persons residing in the community of this district, and to ensure that each county in the district is substantially proportionately represented in the Master Jury Wheel.

A. *Random Selection from Voter Registration List.*

The "random" selection of names from the voter registration lists shall be made by choosing a starting name by a purely random method; and selecting each subsequent name systematically at regular intervals throughout the source list(s) as hereinafter described. This procedure ensures that: (a) names chosen will represent all segments of the source list or file from which drawn, (b) the mathematical odds of individual names being picked are substantially equalized, and (c) the possibility of human discretion or choice affecting the selection of any individual's name is eliminated.

B. The term "voter registration list(s)" as used herein shall mean the *official records of persons registered to vote in the most recent national general election,* established and maintained by county boards of elections in compliance with Chapter 163 of the General Statutes of North Carolina and any rules and regulations promulgated pursuant thereto by the North Carolina State Board of Elections.

C. The selection of names shall be made by the Clerk, or made under his direction or supervision. The Clerk is authorized to use personnel of county boards of elections and to use automated data processing equipment in counties having such equipment to make the name selections, provided names are selected at random in compliance with the Act and this Plan.

## VI.

### MASTER JURY WHEEL

A. *General Requirements.*

(1) The Clerk shall establish and maintain, or cause to be maintained, one Master

Jury Wheel for this District, as defined in section 1869(g) of the Act. *The Master Jury Wheel shall contain the names of those persons selected at random for prospective jury duty.* The physical form of records on which names for the Master Jury Wheel are kept may include such automated data storage devices as punched cards, magnetic tapes, or magnetic disc files.

(2) The *minimum number of names to be placed in the Master Jury Wheel shall be at least one-half of one per centum of the total number of persons on the voter registration lists in all the counties within the* District. The Court may direct that additional names be placed in the Master Jury Wheel at any time. Any such additional names shall be selected at random from voter registration lists in compliance with the Act and this Plan.

(3) *Commencing in January of 1981, and every fourth year, thereafter, the Master Jury Wheel shall be emptied and refilled in* the manner set forth in this Plan.

(4) To ensure the random selection of a fair cross section of the persons residing within the District, whose names are to be placed in the Master Jury Wheel, the names appearing on the county-wide active voter registration lists shall be considered in alphabetical order of their appearance on the voter registration lists, or in numerical order of their appearance on the voter registration lists, if they are found to have been numbered in a random manner.

(5) If precinct lists of registered voters are used as a source of names, they shall be considered in numerical order (if the precincts are designated by number in a given county) or in alphabetical order (if the precincts are designated by name) and the total considered to be a county-wide list of registered voters.

B. *Selection of Names.*

(1) The *Court shall determine the total number of names to be selected at random from voter registration lists and placed in the Master Jury Wheel.* The Clerk shall select, or cause to be selected as provided herein, the number of names from each county voter registration list to be placed in the Master Jury Wheel, which will give each county substantially the proportionate representation in the Master Jury Wheel that its total number of registered voters bears to the total number of registered voters in the District. The selection may be made either manually or through the use of automated data processing equipment or a combination of both methods.

(2) To secure proportionate, or substantially proportionate, representation in the Master Jury Wheel, the total number of registered voters in the District, as reflected in the latest statistical report published by the North Carolina State Board of Elections, shall be divided into the total number of registered voters in each county within the District. The resulting percentages of the total shall determine the number of names from each county to be placed in the Master Jury Wheel for the District.

(3) When the number of names needed from the voter registration list of each county has been thus determined, a ratio number or quotient shall be determined and used to ensure a random, objective and fairly distributed selection of names from each county. The ratio number shall be determined by dividing the total number of registered voters in the District by the number fixed by the Court to be placed in the Master Jury Wheel. For example, if 10,000 names are to be placed in the Master Jury Wheel and there are 920,000 voters registered, the ratio number or quotient would be $920,000 \div 10,000$ or 92. Therefore, every 92nd name on the voter registration list would be selected. If the ratio number selected, for example, is 92, there shall be placed 92 numbers in a container. The Clerk shall publicly draw one of those numbers. The number drawn shall be known as the starting number. If, for example, the starting number drawn is 15 and ratio number is 92, the first name to be placed in the Master Jury Wheel from each county shall be the 15th name appearing on

a given county voter registration list; the second name shall be the 107th name; the third shall be the 199th name, and so on throughout the voter registration list of that county.

(4) When selection from a county list of registered voters is made manually, the choosing of names shall be by counting names on the list, either in a numerical, alphabetical, or other logical consistent sequence. For such counting and selecting process the entire list shall be covered and the specific names selected according to the established ratio number or quotient and starting number formula described above. In lieu of making an actual physical count of names, a measuring device that expresses name intervals in terms of inches of cards in a file or space on a page may be used provided it substantially approximates the desired ratio number or quotient intervals between selected names that an actual name count would produce.

(5) Numbers shall be assigned to the names selected from each county voter registration list. The numerical lists from all counties within the District shall be combined to form one numbered district list of names.

C. *Completion of Juror Qualification Form.*

(1) *When directed by the Court, the Clerk shall publicly draw or select, or cause to be drawn or selected, at random from the Master Jury Wheel the names of as many persons as may be required for identification of qualified jurors for jury service for a particular period.* No subsequent or additional drawing or selection need be made unless and until the Court determines that the number of persons in the Qualified Jury Wheel available for service should be increased. An alphabetical list of the names drawn shall be prepared, which list shall not be disclosed to any person except pursuant to this Plan and sections 1867 and 1968 of Title 28 U.S. Code. The selection of names and the preparation of alphabetized lists may be done by automated data processing equip-

ment. The *Clerk shall mail, or cause to be mailed, to every person whose name is drawn from the Master Jury Wheel a juror qualification questionnaire, accompanied by instructions to fill out and return the form, duly signed and sworn, to the Clerk, by mail, within ten (10)* days. The questionnaire form shall be Form AO–178, as it now exists or as hereafter amended, or such other form as is hereafter prescribed pursuant to section 1869(h) of the Act. If a person is unable to fill out the juror qualification questionnaire, another shall do it for him and shall indicate that he has done so and the reason therefor. In any case in which it appears that there is an omission, ambiguity or error in form, the Clerk shall return the form with instructions to the person to make such additions or corrections as may be necessary and return the form to the Clerk within ten (10) days.

(2) Any person who fails to return a completed juror qualification form as instructed may be summoned by the Clerk forthwith to appear before the Clerk and to fill out a juror qualification form; provided, that any person who returns an executed juror qualification form by mail, and who is subsequently summoned for service on grand or petit jurors, may be required by the Clerk to fill out another juror qualification form in the presence of the Clerk. Any person who fails to appear as directed, or who appears to have willfully misrepresented a material fact on a juror qualification form for the purpose of avoiding service as a juror, may be ordered by the Court to appear and show good cause, if he can, for his failure to appear or his apparent misrepresentation on the juror form.

(3) Returned questionnaires shall be examined to determine qualifications for jury service. Only objective criteria may be used to determine, solely on the basis of information provided on the juror qualification form and other competent evidence, whether a person is unqualified for, or exempt, or to be excused from jury service.

(4) Questionnaires indicating that the prospective jurors are disqualified, or are

excused, exempt or excluded as by law provided, shall be so marked and filed separately. All other questionnaires shall be placed on file, and the names of these prospective jurors shall constitute the Qualified Jury Wheel.

### D. *Excuses on Individual Request.*

The Court finds that jury service by members of the following listed groups of persons or occupational classes would entail undue hardship or extreme inconvenience to the members thereof; and that excusing such members will not be inconsistent with sections 1861 and 1862 of the Act; therefore, excuses shall be granted upon individual request, to:

(1) all persons 70 years of age or older; and

(2) physicians, dentists, attorneys, and registered nurses actively engaged in the practice of their professions.

### E. *Exemption from Jury Service.*

The Court finds that exemption of the following groups of persons or occupational classes is in the public interest and would not be inconsistent with sections 1861 and 1862 of the Act; therefore, members of such groups are barred from jury service on the ground that they are exempt:

(1) persons in active service in the Armed Forces of the United States;

(2) members of fire or police and sheriff's departments of the State of North Carolina, or any political subdivision thereof; and

(3) public officers in the executive, legislative, or judicial branches of the Government of the United States, or the State of North Carolina, or any political subdivision thereof, who are actively engaged in the performance of official duties.

### F. *Determination of Qualifications, Excuses and Exemptions.*

(1) Judge Ward on his own initiative, or upon recommendation of the Clerk, shall determine solely on the basis of information provided on the juror qualification form and other competent evidence whether a person is unqualified for, or exempt, or to be excused from jury service. The Clerk shall enter such determination in the space provided on the juror qualification form and the alphabetical list of names drawn from the Master Jury Wheel. If a person did not appear in response to a summons, such fact shall be noted on said list.

(2) In making such determination, Judge Ward shall deem any person qualified to serve on grand and petit juries in the District unless he—

(a) is not a citizen of the United States, eighteen years old, who has resided for a period of one year within this judicial district;

(b) is unable to read, write and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;

(c) is unable to speak the English language;

(d) is incapable, by reason of mental or physical infirmity to render satisfactory jury service; or

(e) has a charge pending against him for the commission of, or has been convicted in a State of Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.

## VII.

### QUALIFIED JURY WHEEL

### A. *Qualified Jurors.*

The *Clerk shall maintain, or cause to be maintained, a Qualified Jury Wheel, as defined in section 1869(g) of the Act, for the District and shall place, or cause to be placed, in such wheel the names of all persons drawn from the Master Jury Wheel, who are determined to be qualified as jurors and are not exempt or excused pursuant to this Plan.*

### B. Drawing of Jurors' Names From Qualified Jury Wheel.

After reasonable public notice in compliance with 28 U.S.C. section 1866 and 1869(k) and regulations of the Judicial Conference of the United States, the Clerk shall cause to be drawn at random, the names of enough qualified jurors to meet the needs of this Court and the Bankruptcy Court for grand juries and petit juries. Summonses may be prepared in the random order the names were drawn and later issued by the Clerk in that order for jurors as needed by the Court. The drawing of names and preparation of summonses may be done by utilizing automated data processing equipment. The names of persons summoned shall be listed separately for grand jury and petit jury panels.

### C. Service of Summonses.

Each person drawn for jury service may be served personally or by registered or certified mail, addressed to the person at his usual residence or business address. Unless otherwise directed by the Court, summonses shall be served by the Clerk or his duly designated deputies, using forms approved and provided by the Administrative Office of the U.S. Courts, who shall make affidavit of service and shall file with such affidavit the addressee's receipt for the registered or certified summons.

The issuance and service of a summons for the first day of a period of service requires the juror's continued attendance as directed by a judge of the Court, or by the Clerk on behalf of the Court, until the juror is excused.

### D. Disclosing Identity of Jurors.

(1) The names of prospective jurors drawn from the Qualified Jury Wheel or summoned for any session of court, or for a specific case, shall not be disclosed prior to their reporting for duty except in compliance with instructions of the Court.

(2) The Clerk shall make available to counsel for the parties, or to any party appearing *pro se*, a jury list which sets forth the name, general address and occupation of each juror summoned and reporting, after court is opened for the session or case for which the jurors were summoned.

## VIII.

### JURY SERVICE

### A. Basis for Excuses or Exclusions.

Any person summoned for jury service may be:

(1) excused, as the Court may direct, upon a showing of undue hardship or extreme inconvenience (as defined in subsection B) for such period as the Court deems necessary, at the conclusion of which such person shall be summoned again for jury service: provided that if the circumstances causing undue hardship or extreme inconvenience to the prospective juror may be reasonably expected to continue for an indefinite period, the prospective juror may be excused until all other jurors in the Qualified Jury Wheel have been summoned;

(2) excused from service or attendance for prospective jury service, except when necessary to complete service in a particular case, upon a showing of prior attendance or service in federal court (within a period of two years next preceding the date for which summoned) of

 (a) more than 30 days as a petit juror,

 (b) service on more than one grand jury, or

 (c) service as both a grand and petit juror;

(3) excluded by the Court on the ground that such person may be unable to render impartial jury service or that his service as a juror would be likely to disrupt the proceedings;

(4) excluded upon peremptory challenge as provided by law;

(5) excluded pursuant to the procedure specified by law upon a challenge by any party for good cause shown;

(6) excluded upon determination by the Court that his service as a juror would be likely to threaten the secrecy of the pro-

ceedings; or otherwise adversely affect the integrity of jury deliberations; or

(7) excluded upon a determination by the Court that such person is not qualified for jury service on one or more of the grounds set out in section 1865 of the Act.

Whenever a person summoned for jury service is found to be disqualified, exempt, or is excused or excluded from jury service, the Clerk shall note the specific reason therefor in the space provided on his juror qualification form unless the reason is stated in the Court's jury selection and service files or is included in the trial record.

B. *Assignment to Panels.*

When the names of jurors have been drawn at random from the Qualified Jury Wheel and summoned to report on a particular date, or otherwise notified to report on a series of dates, the Clerk shall assign jurors to panels in the random order in which they were summoned unless otherwise ordered by the Court. The names of jurors who have been temporarily excused shall be freely inserted in subsequent panel to the end that all jurors summoned will serve an equal, or nearly equal amount of time.

The Clerk is authorized to act for the Court, under the supervision and control of a judge of this Court or the Bankruptcy Court, and excuse temporarily any person summoned for jury service, pursuant to section VIII, subsection (A)(1) and (2) of this Plan. "Undue hardship or extreme inconvenience" shall mean great distance, either in miles or travel time, from the place of holding court, grave illness in the family or any other emergency which outweighs in immediacy and urgency the obligation to serve as a juror when summoned, or any other factor which the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror; and in addition, in situations where it is anticipated that a trial or grand jury proceeding may require more than thirty days of service, the court may consider, as a

further basis for temporary excuse, severe economic hardship to an employer which would result from the absence of a key employee during the period of such service. Persons who have served on a grand jury under this Plan shall not be recalled for jury service during the four-year period the existing Master Jury Wheel is in use. Jurors who actually serve on a petit jury may be recalled for jury service as directed by Judge Ward.

## IX.

### USE OF AUTOMATED OR ELECTRONIC DATA PROCESSING EQUIPMENT IN JURY ADMINISTRATION

The Court finds that the use of automated or electronic data processing equipment and methods in jury administration can be advantageous in selecting and copying names for the Master Jury Wheel from voter registration lists in counties that maintain such lists in machine-readable form such as punched cards, magnetic tapes, or magnetic discs; and that it may be advantageous to employ a combination of manual and electronic methods in selecting names from lists in those counties maintaining voter registration in written or printed form, whereby the names initially selected manually are recorded on punched cards or tapes for subsequent processing by electronic data processing equipment.

Therefore, a properly programmed automated or electronic data processing system or a combination system employing both manual and machine methods may be used, at the Clerk's option, to:

(1) select names for the Master Jury Wheel from voter registration lists of any or all counties in the District, provided that the required proportions of names for each county are maintained and that the above-described ratio number or quotient and starting number formula is followed;

(2) select and copy names from the Master Jury Wheel of persons to whom juror qualification questionnaires are to be sent, address and mail such

questionnaires, and perform other related clerical tasks;

(3) establish and maintain a Qualified Jury Wheel, containing at all times an adequate number of names, from which there shall be drawn the names of jurors required for assignment to panels for service as needed by this Court and the Bankruptcy Court and, at the option of the Clerk, prepare and mail completed juror summons forms to prospective jurors; and

(4) prepare such papers, records, and statistical analyses and reports as may be required in the administration of the jury system.

In the use of automated or electronic data processing equipment in the performance of any task in the administration of this jury selection and service plan, the data processing system shall be so programmed as to ensure a random selection of the required number of names from the entire source list, employing the starting number and ratio number or quotient formula described herein so that any group of names chosen will represent all segments of the source file from which they are drawn; and the mathematical odds of any individual names being selected are substantially equal. If the names, in a Master or Qualified Jury Wheel are arranged by computer in an unbiased, random order using an electronically computed random number generator, selection from such randomized list in the order in which the names appear on that list shall be acceptable as meeting the tests of randomness and representativeness set out above.

## X.

### GRAND JURIES

The Clerk shall summon from the Qualified Jury Wheel, as and when directed by a judge, a sufficient number of jurors, selected at random, to form a panel of 23 jurors to serve as a grand jury for a term not exceeding 18 months. Two or more grand juries may be summoned to serve simultaneously.

## XI.

### PLAN APPLICABLE TO BANKRUPTCY COURT JURY USAGE

A. *Plan Applicable to Bankruptcy Court.*

This plan shall, where applicable, govern jury selection and administration procedures in jury usage in the Bankruptcy Court.

B. *Jurors Summoned for Bankruptcy Court.*

The Clerk of this Court will summon from the Qualified Jury Wheel jurors needed for service in the Bankruptcy Court for this District. Jurors summoned for attendance and service in this Court may be re-assigned to the Bankruptcy Court for service. Jurors summoned for attendance in the Bankruptcy Court may likewise be re-assigned for service in this Court. The judges of the Bankruptcy Court (or the Clerk of the Bankruptcy Court, if authority has been delegated to him) will use all reasonable efforts in scheduling jury trials, in cooperation with the Clerk of this Court, to avoid unnecessary jury calls and to ensure efficient and economical jury usage by both courts.

This the 5th day of December, 1980.

s/ Eugene A. Gordon
Chief Judge
United States District Court

s/ Hiram H. Ward
Judge
United States District Court

s/ Richard C. Erwin
Judge
United States District Court

### *Appendix B*

DATE: August 17, 1983
REPLY TO
ATTN OF: J. P. Creekmore, Clerk
SUBJECT: 1983 Juror Qualification Process
TO: Chief Judge Hiram H. Ward

This memorandum summarizes the *finalization of our 1983 juror qualification process.*

On June 6, 1983, the Jury Deputy delivered the corrected *questionnaire mailing* list to the Southern Life Insurance Computer Center with instructions to Mr. Vetter to delete everyone who was not qualified (red lines had been drawn through all deletions), make address corrections and run a new list of the qualified prospective jurors. This list was proofed for correctness by the Jury Deputy and returned to Mr. Vetter. Mr. Vetter randomized the list and printed summonses and vouchers in the same random order.

Attached is the final tabulation reflecting by county the different classification totals. Out of the *initial 5013 questionnaires mailed on February 7, 1983, 3079 prospective jurors were determined to be qualified (61.42%).*

Permanent files have been made for all questionnaires and other data collected during the qualification process.

For your additional information:

(a) 15.50 percent of the registered voters in our district are black;

(b) 14.62 percent of our qualified jury wheel consists of black prospective jurors;

(c) 19.06 percent of the population (18 years of age and older) in this district is black (1980 census); and

(d) 15.36 percent of the names in the juror qualification mailing list (out of the 5013 names) were black.

JPC/dk

Attachment